**TRAWLER DIANE MARIE, INC., Plaintiff,**

v.

**Ronald H. BROWN, Secretary of Commerce of the United States of America, Defendant.**

**No. 95–15–CIV–2–D.**

United States District Court, E.D. North Carolina, Elizabeth City Division.

Aug. 2, 1995.

abled"; it regarded him as not certifiable under DOT regulations.

William S. Daniels, Kellogg, White, Evans & Gray, Manteo, NC, for plaintiff.

Rudy A. Renfer, Jr., U.S. Attorney's Office, Raleigh, NC, for defendant.

## MEMORANDUM OF DECISION

DUPREE, District Judge.

Plaintiff, Trawler Diane Marie, Inc., brings this action against defendant, Ronald H. Brown, the Secretary of Commerce of the United States (Secretary), pursuant to the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1801, *et seq.* (Magnuson Act), and the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* (APA). Plaintiff is the owner and operator of the fishing vessel "Mister Big." Plaintiff seeks review of the decision by the Secretary to effect the temporary closure of the scallop fishery in the federal waters[1] off the coast of Alaska. The matter is presently before the court on cross-motions for summary judgment.

On February 23, 1995, the Secretary caused the federal waters off the Alaskan coast to be closed to scallop fishing for 90 days. The interim closure was extended for an additional 90 days effective May 31, 1995. The Secretary's decision to close the scallop fishery was prompted by the unregulated fishing in the EEZ on the part of the Mister Big. Plaintiff takes issue with the necessity of the closure and the procedures undertaken to accomplish it.

Prior to the emergency closure, the scallop fishery in the federal waters off the Alaskan coast had not been regulated by the federal government. Previously, the State of Alaska was able to regulate the scallop fisheries off its coast, in both state and federal waters, because all fishing vessels venturing into the waters were registered in Alaska and thus bound by the state's fishing regulations. Under the Magnuson Act, a state may only regulate fishing in federal waters if the vessel is registered under the law of that state. 16 U.S.C. § 1856(a)(3).

Alaska had regulated the scallop fisheries by, among other means, establishing opening and closing dates for harvest and setting harvest quotas. This year, Alaska closed the scallop season in the Prince William Sound area, where the Mister Big was fishing, on January 26, 1995. The state-set quota for the area, 50,000 pounds of scallops, was harvested in just sixteen days. Following the close of the scallop season, the Alaskan-registered boats returned to their Alaskan ports. However, the Mister Big continued to dredge for scallops in the area. It was soon learned that the Mister Big had sailed to the EEZ off the Alaskan coast directly from Seattle, Washington and that plaintiff had renounced its State of Alaska fishery permit in January 1995. Consequently, Alaskan authorities had no basis for asserting jurisdiction over plaintiff's fishing vessel.

Alaskan authorities pressed for federal regulation that would close the perceived

---

1. The federal waters are those lying between 3 to 200 miles off the coast, also known as the Exclusive Economic Zone (EEZ).

loophole that enabled the Mister Big to engage in unregulated fishing. On February 17, the North Pacific Fishery Management Council (NPFMC), the body responsible for preparing proposed fishery management plans (FMP's) for the region, recommended an emergency closure of the scallop fishery in the federal waters off Alaska's coast. The NPFMC was concerned that continued unregulated dredging by the Mister Big could precipitate localized depletion of scallop stocks. The NPFMC voted by emergency teleconference on February 17, 1995 to recommend the closure of the scallop fishery in the EEZ off the Alaskan coast. The Secretary, on February 23, 1995, approved the emergency closure of the scallop fishery and, on May 31, 1995, extended the closure for an additional 90 days.

Plaintiff complains that it was not given notice and an opportunity to comment on the emergency rule, that the Secretary improperly concluded that the Mister Big's activities constituted an emergency situation, and that the Secretary assembled the administrative record to support his decision after the emergency rule had already been promulgated. Plaintiff also contends that the Magnuson Act's National Standards were not adhered to relative to the interim closure and that the dictates of the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* (NEPA), and Executive Order 12866 were disregarded by the Secretary.

The Magnuson Act was enacted in 1976 with the goals of conserving and managing the nation's fisheries resources and promoting the domestic fishing industry. 16 U.S.C. § 1801(b). The EEZ is divided into eight regions, each with a governing Regional Fishery Management Council. 16 U.S.C. § 1852. The regional Fishery Management Councils (Councils) are responsible for the preparation of proposed FMP's governing fish harvests within their respective jurisdictions for submission to the Secretary. *Id.* The Secretary reviews the Councils' recommendations for consistency with seven National Standards, or management principles, set forth in the Act and other applicable law. 16 U.S.C. § 1854. The Secretary then either approves or disapproves the Councils' recommendations. *Id.*

■ Under the Act, the Secretary may, upon a finding that "an emergency exists involving any fishery, ... promulgate emergency regulations necessary to address the emergency." 16 U.S.C. § 1855(c); *See, e.g., Parravano v. Babbitt,* 837 F.Supp. 1034, 1041 (N.D.Cal.1993). The Secretary can promulgate such 90–day emergency regulations even where there is not an FMP existent for the subject fishery. 16 U.S.C. § 1855(c). The judicial review provisions of the Magnuson Act are found at 16 U.S.C. § 1855(b). The Act incorporates the APA standard of review. *Id.* Accordingly, courts may only invalidate a challenged regulation if the regulation is (1) arbitrary and capricious or an abuse of discretion; (2) unconstitutional; (3) in excess of statutory jurisdiction; or (4) was promulgated without observance of procedure required by law. 5 U.S.C. § 706(2); *Parravano,* 837 F.Supp. at 1041–42; *Southeastern Fisheries Association, Inc. v. Mosbacher,* 773 F.Supp. 435, 439 (D.D.C.1991). The limited scope of judicial review applies with equal force to review of emergency regulations. *Parravano,* 837 F.Supp. at 1042 (*citing Pacific Coast Federation v. Secretary of Commerce,* 494 F.Supp. 626, 633 (N.D.Cal. 1980)).

## *SUPPLEMENTATION OF ADMINISTRATIVE RECORD*

In support of its motion for summary judgment, plaintiff has filed two affidavits and defendant has moved to have them stricken. Plaintiff alleges that the administrative record was compiled after the decision to close the scallop fishery was made and that the record merely contains *post hoc* justifications for the Secretary's action. Plaintiff also contends that certain evidence was not correctly interpreted by the Secretary or his designees. Plaintiff further charges that defendant acted in bad faith and that the real reason for the closure was the lack of personnel to manage the fishery, not an emergency situation caused by plaintiff's vessel.

■ The law governing supplementation of an administrative record was set forth in

the court's May 3, 1995 order and will not be repeated here. Suffice it to say, judicial review of agency action is ordinarily constrained to the administrative record and consideration of extra-record evidence is allowed only under exceptional circumstances. *Virginia Agricultural Growers Association, Inc. v. Donovan,* 774 F.2d 89 (4th Cir.1985). The court previously granted defendant's motion for protective order so as to preclude discovery in this action, but left open the possibility of supplementation in the future if plaintiff could make a showing of need to go outside the administrative record. Order of May 3, 1995.

■ The court finds that plaintiff has not proffered sufficient evidence of agency bad faith or improper motive to justify consideration of extra-record evidence. Plaintiff has merely alleged that the Secretary drew different conclusions from the evidence before him than did plaintiff's experts. The record adequately permits judicial review of the Secretary's actions and there is no need to supplement it. Accordingly, defendant's motion to strike the DuPaul–Kirkley and Fletcher affidavits is hereby granted.[2]

The court will proceed to consideration of the parties' cross-motions for summary judgment based on the materials before the Secretary at the time he promulgated the emergency rule. The law relating to the grant of summary judgment is so well-known that it need not be repeated here.

### PROCEDURAL ISSUES

1. *Finding that Emergency Situation Existed*

■ Plaintiff first contends that the purported crisis involving the Mister Big did not constitute an emergency so that emergency action by the Secretary was unwarranted. Under applicable regulations, the Secretary cannot implement an emergency regulation to solve a long-recognized but ignored problem. 57 Fed.Reg. 375. Rather, the genesis of the emergency regulation must involve "recent, unforeseen events or recently dis-

covered circumstances...." *Id.* For the Secretary's action to withstand judicial scrutiny, there must have been a reasonable finding that an emergency existed. *Pacific Coast,* 494 F.Supp. at 633.

Plaintiff first asserts that federal authorities had ample time to address any conservation concerns with respect to the scallop fishery without resorting to emergency action. As evidence of its claim, plaintiff points to the preparation by the NPFMC of a draft FMP for the scallop fishery. The proposed FMP was drafted in 1993 but was not adopted at an April 1994 meeting of the NPFMC. Plaintiff cites to portions of the FMP specifically addressing the possibility that an unregulated vessel might fish for scallops in the EEZ off the Alaskan coast as evidence that the Mister Big's activities in the area were not unforeseen. AR 8, at pp. iii-iv. Thus, plaintiff alleges, unregulated scallop fishing off the Alaskan coast could not constitute an emergency.

Defendant submits that the reason the proposed FMP was not adopted in April 1994 was because of the belief that all vessels fishing in the EEZ would be registered in Alaska and thus bound by the state's regulations. Defendant steadfastly maintains that the Mister Big's unregulated fishing did indeed rise to the level of an emergency. Conceding that the possibility of a non-Alaskan vessel fishing in the EEZ had been previously considered by the Secretary's designees, defendant argues that the potentiality of unregulated vessels was only discussed during the calendar year preceding the Mister Big's voyage to the EEZ. This, defendant asserts, cannot amount to long-term inaction which would preclude emergency action by the Secretary.

Plaintiff next contends that one of the three requisite criteria for a finding of an emergency situation was absent with respect to the scallop fishery. *See* 57 Fed.Reg. 375. Plaintiff takes issue with the Secretary's finding that a serious conservation or management problem existed at the time the Secretary took emergency action. As sup-

---

2. The declaration of Steven T. Barry, offered to rebut the allegations contained in the affidavits submitted by plaintiff, will likewise not be considered by the court in its disposition of the summary judgment motions.

port for its contention, plaintiff cites to an August 1, 1994 National Marine Fisheries Service (NMFS) report indicating a lack of reliable stock assessment information with respect to the weathervane scallops in the waters off the Alaskan coast. Plaintiff considers it incomprehensible that the unregulated fishing of its vessel could create a serious conservation or management problem where such concerns had not been previously voiced. Plaintiff, citing a February 22, 1995 memorandum from NMFS Director, Steven Pennoyer, to Rolland Schmitten (AR 41), posits that the true reason the scallop fishery was closed was because the NMFS did not have sufficient resources to manage the fishery.

Defendant responds that a serious conservation problem was created by the Mister Big's unregulated fishing inasmuch as state-set quotas for scallops would be exceeded were the Mister Big to continue with its activities. Another conservation issue raised by unregulated fishing, defendant posits, was the potential for excessive crab bycatch. Defendant further cites the potential for trouble between the Mister Big and the Alaskan scallopers who were forced to return to the docks as a potential management problem.

The court agrees that the Secretary made a reasonable finding that an emergency existed. The Secretary effected the emergency closure of the scallop fishery after learning that the Mister Big, alone, had harvested more scallops than was allocated for the entire scallop fishing fleet in the Prince William Sound area. Plaintiff candidly concedes that the 50,000 pound limit for the area may have been "slightly exceeded." Plaintiff's Reply p. 17. It is immaterial how much of the Mister Big's catch came from areas outside Prince William Sound or how abundant the scallop population in Alaskan waters is. The Secretary reasonably concluded that continued unbridled dredging by the Mister Big could lead to localized depletion of the scallop stocks. AR 1, 60 Fed.Reg. 11054, 11056. At the time the Secretary promulgated the emergency rule and the 90–day extension of the rule, the Secretary knew that the 50,000 pound quota for Prince William Sound had been harvested by the Alaskan boats partici-

pating in the harvest and that the Mister Big alone had taken in some 52,000 pounds of scallops. In addition, the Secretary's concern is even more justified given that the 168–foot Mister Big is reportedly capable of harvesting 65,000 pounds of scallops per week. In light of the above facts, the Secretary could reasonably find that emergency regulation was necessary. The fact that federal authorities recognized the "management void" sometime before the Mister Big's venture to the Alaskan waters does not sway the court from this conclusion. The above facts also support the Secretary's conclusion that continued unregulated fishing by the Mister Big posed serious conservation and management problems.

### 2. *Notice and Opportunity to Comment*

■ Plaintiff next contends that it was not afforded notice and an opportunity to comment with respect to the interim closure. Defendant answers that plaintiff was afforded the process it was due and that plaintiff did, in fact, submit comments. See AR 107. Although public comment on the interim emergency closure was solicited, *see* AR 1 at 11056, plaintiff asserts that it should have been contacted before the decision to take emergency action was made. Plaintiff takes this position due to the fact that the emergency rule was prompted by the specific activities of the Mister Big and because the Secretary and his designees were aware of how to reach plaintiff's representatives. Additionally, plaintiff avers that the NPFMC solicited comments from Alaskan fishermen, favorable to the emergency rule, in an effort to "sanitize the record." Plaintiff's Brief in Support, p. 9.

Section 1852(j)(2)(C) of Title 16 requires that the public be given timely notice of any emergency Council meeting. However, notice can be foregone under extraordinary circumstances. *Parravano*, 837 F.Supp. at 1048 (emergency situation constitutes "good cause" to dispense with normal notice and comment procedures). It appears from the record that federal authorities first became aware of the vessel's activities on February 10, 1995. AR 9. The court is persuaded that the Secretary acted in good faith in reacting

promptly to the bona fide emergency situation which presented itself when the Mister Big proceeded to engage in unregulated fishing in the EEZ. Faced with the possibility of localized depletion of the scallop stocks had the Mister Big been allowed to continue with its operations, the Secretary acted reasonably in foregoing normal notice and comment procedures.

■ There is an additional ground for not overturning the emergency rule based on the purported procedural irregularities. The court agrees with the reasoning of the Ninth Circuit in *Alaska Factory Trawler Association v. Baldridge*, 831 F.2d 1456, 1464 (9th Cir.1987), where the court held that "[i]f the Secretary has followed the appropriate rule-making procedures and has established a rational basis for his action . . ., procedural challenges for irregularities at the Council level will not provide a justification for invalidating the regulations." *See also Louisiana v. Baldridge*, 538 F.Supp. 625, 630 n. 1 (E.D.La.1982) (procedural irregularities not "actionable absent affirmative proof that the deviation makes the Secretary's [decision] . . . arbitrary and capricious)." In the instant case, the court finds that any procedural irregularities that might have occurred at the Council level did not materially affect the Secretary's decisionmaking so as to render the emergency rule infirm.

### 3. *Compilation of Administrative Record*

■ Plaintiff next complains that the Secretary did not have the administrative record before him at the time he promulgated the emergency rule. Plaintiff contends that a record which would support the Secretary's decision was simply compiled after approval of the interim closure of the scallop fishery. Defendant admits that the administrative record was assembled after promulgation of the emergency rule, but insists that all the documents therein existed at the time and were considered prior to action by the NPFMC and the Secretary. Defendant insists it is irrelevant that the documents comprising the administrative record were not actually physically bound together as of February 23, 1995.

The court finds that plaintiff's contention lacks merit. It is of no moment that the administrative record was not amassed until after the decision to close the scallop fishery was made. It is enough that a reviewing court can examine the information upon which the Secretary relied to determine whether there exists a rational connection between the evidence and the Secretary's exercise of discretion. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971). In this case, the administrative record adequately allows for the court's review of the Secretary's actions.

### MERITS OF SECRETARY'S DECISION

Plaintiff also attacks the substantive merits of the Secretary's decision to close temporarily the EEZ to scallop fishing, contending that the Secretary's decision was arbitrary and capricious. Plaintiff argues that three of the seven National Standards that are to guide all action taken under the Magnuson Act were disregarded when the Secretary effected the interim closure of the scallop fishery. It is clear that the National Standards are to be adhered to even when the Secretary takes emergency action. 57 Fed. Reg. 375; *Parravano, supra.*

### 1. *National Standard One*

■ National Standard One provides that: Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

16 U.S.C. § 1851(a)(1). Optimum yield is to be based on the maximum sustainable yield (MSY) for a stock. *See* 50 C.F.R. § 602.11(b). Applicable regulations mandate that "overfishing" be defined in a manner that will facilitate monitoring and evaluation of the condition of the subject stock. *See* 50 C.F.R. § 602.11(c).

Plaintiff argues that there was inadequate consideration of the condition of the weathervane scallop stock prior to promulgation of the emergency rule. Plaintiff points to the NPFMC's August 1, 1994 proposed FMP wherein it was reported that "numerical esti-

mation of MSY for weathervane and other scallop species is not possible at this time." AR 8, at p. iii. According to plaintiff, the emergency rule is defective because there is no way to determine whether the optimum yield for the scallop fishery is being achieved. Plaintiff further argues that a formal cost-benefit analysis should have been conducted to determine if the complete closure of the scallop fishery was warranted.

Defendant counters that the appropriate analysis is whether the interim closure precludes the attainment of optimum yield in the future. Defendant posits that it does not for four reasons: (1) the prevention of overfishing during the interim closure will help guarantee the long-term health of the fishery once it is re-opened; (2) the scallops not harvested during the closure will still be available upon the re-opening of the fishery because the weathervane scallop is a long-lived resource; (3) unregulated fishing could lead to stock depression; and (4) unregulated scallop fishing could result in excessive crab bycatch. Thus, defendant asserts that the Secretary reasonably concluded that the interim closure of the fishery was consistent with National Standard One.

The court agrees that the Secretary could rationally conclude that the interim closure of the scallop fishery would not hinder the long-term achievement of optimum yield for the fishery. The Secretary rationally concluded that the long-term health of scallop stock would be facilitated by an interim closure designed to avert overfishing of the species. Thus, the Secretary's decision will not be set aside on the ground that it is inconsistent with National Standard One.

### 2. *National Standard Two*

National Standard Two requires that "[c]onservation and management measures [ ] be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). Plaintiff contends that the Secretary's decision is not supported by the concrete analysis mandated by the Act. In particular, plaintiff insists that a Stock Assessment and Fishery Evaluation (SAFE) report, detailing the best scientific information concerning a stock or fishery, should have been prepared with re-

spect to the weathervane scallop in the waters off the Alaskan coast. *See* 50 C.F.R. § 602.12(e) (dealing with details of SAFE reports for FMP's). Without a stock assessment, plaintiff reasons, there exists insufficient evidence from which the Secretary could conclude that closure of the fishery was necessary. In addition, plaintiff attacks federal officials' reliance on state guideline harvest ranges (GHR's) in considering the propriety of emergency closure of the fishery. Plaintiff also takes issue with the Secretary's working assumptions regarding the stock structure of weathervane scallops and the conclusions to be drawn from the shift to smaller and younger scallops in the harvest in recent years.

Defendant answers that the Secretary acted reasonably, albeit cautiously, in effecting the interim closure of the scallop fishery based on the information then available to him. Defendant asserts that the lack of complete information about a fishery should not preclude conservation efforts on the part of the Secretary. Defendant further explains that a stock assessment is not a prerequisite to regulation and that the Secretary did not unduly rely on the state GHR's in making his decision.

The court agrees that the Secretary rationally concluded that the closure decision was consistent with the dictates of National Standard Two. While it is true that the scientific information about the weathervane scallop is inconclusive, that fact does not preclude the Secretary from acting based upon the information that is available to him. "[T]he Magnuson Act does not force the Secretary and Councils to sit idly by, powerless to conserve and manage a fishery resource, simply because they are somewhat uncertain about the accuracy of relevant information." *National Fisheries Institute, Inc. v. Mosbacher*, 732 F.Supp. 210, 220 (D.D.C.1990); *accord Southeastern Fisheries Association*, 773 F.Supp. at 442; *see also City of Las Vegas v. Lujan*, 891 F.2d 927, 932–33 (D.C.Cir.1989) (recognizing, in case brought under Endangered Species Act, that Secretary must sometimes act based upon inconclusive data). Since decisions simply must be based upon the best scientific information

*available*, "the Act acknowledges that such information may not be exact or totally complete." *Parravano*, 837 F.Supp. at 1046 (*citing Washington Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1448–49 (9th Cir. 1990)). It is enough that the Secretary did not disregard scientifically superior evidence. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir.1992) (faced with uncertain data, Secretary has discretion to choose which data on which to rely); *City of Las Vegas*, 891 F.2d at 933 (interpreting phrase under Endangered Species Act with respect to emergency action). In the case at bar, there is no evidence that the Secretary did so.

Additionally, the Secretary rationally concluded that the potential for localized depletion of scallop stocks existed given the fact that the state-set GHR for the area in which the Mister Big was fishing had been exceeded by over 100%. *See* AR 1, at 11055–56. The Secretary's fears concerning overfishing were further substantiated by his interpretation of data indicating that, in recent years, smaller and younger scallops were comprising a greater proportion of the harvest. *See* AR 1, at 11054; AR 6 at p. 16. Based on the above information, as limited as it may be, the Secretary could reasonably conclude that continued unregulated fishing by the Mister Big could lead to overfishing and localized depletion of the scallop stocks in the EEZ off the coast of Alaska.[3] The fact that the Secretary opted for a conservative approach in light of the information available to him, whereas others might draw different conclusions from the same evidence, does not render the Secretary's decision arbitrary and capricious. *Greenpeace Action*, 14 F.3d at 1336 (lack of dispositive evidence "does not render agency's determination 'arbitrary and capricious' "); *Organized Fishermen of Florida, Inc. v. Franklin*, 846 F.Supp. 1569, 1577 (S.D.Fla.1994) (existence of conflicting data does not yield agency's decision faulty).

### 3. *National Standard Three*

■■■ National Standard Three mandates that:

To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

16 U.S.C. § 1851(a)(3). Plaintiff essentially complains that the NPFMC should have worked with the Pacific Fishery Management Council (PFMC), with jurisdiction over the waters off the coasts of Oregon and Washington, so as to ensure a comprehensive management effort with respect to the weathervane scallop.

The court agrees with defendant that plaintiff's argument is meritless. There is no reason to believe that the NPFMC needed to consult with the PFMC. There is no evidence that the officials responsible for the waters off the coasts of Oregon and Washington encountered the same problem which existed in the EEZ off the Alaskan coast, namely, unregulated fishing by the Mister Big. The court agrees that, absent some showing of need for uniform management, National Standard Three is simply not implicated.

The court agrees that, with respect to the National Standards, the Secretary's decision to close temporarily the scallop fishery was not arbitrary or capricious, but instead was a reasonable exercise of his discretionary authority and was supported by substantial evidence.

### COMPLIANCE WITH NEPA

■■■ Plaintiff also contends that the Secretary's actions contravened the dictates of the National Environmental Policy Act. Under NEPA, federal agencies and departments are required to prepare an Environmental Impact Statement (EIS) for any "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS must be prepared "when substantial questions are raised as to whether a project may cause significant degradation of the environment." *Alaska Factory*, 831 F.2d at 1465 (*citing Friends of*

3. The same reasoning applies with respect to the Secretary's presumption that scallops are organized into "discrete localized populations" and

thus vulnerable to localized depletion even though others could proffer contradictory conclusions. *See* AR 6.

*Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985)). An agency's decision not to file an EIS will be upheld if reasonable. *Alaska Factory,* 831 F.2d at 1465 (*citing Foundation for North American Wild Sheep v. Department of Agriculture,* 681 F.2d 1172, 1177 (9th Cir.1982)).

Plaintiff attacks the Secretary's decision not to prepare an EIS based upon the NMFS's Finding of No Significant Impact (FONSI). *See* AR 3. Plaintiff contends that the decision not to file an EIS regarding closure of a "highly-worked fishery" was unreasonable. Plaintiff's Brief in Support, p. 23.

Defendant counters that it is simply too late for plaintiff to raise this issue since the NEPA claim was not pled in the complaint. Additionally, defendant maintains that plaintiff lacks standing to raise a NEPA claim because plaintiff has alleged only economic injury, which is outside the zone of interests intended to be protected by that act. Finally, the Secretary defends the merits of the decision not to issue an EIS and contends that plaintiff has presented no evidence which would undercut that determination.

■ To successfully present a challenge to agency action, a plaintiff must assert an interest "arguably within the zone of interests to be protected by the statute ... in question." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Shanty Town Associates Limited Partnership v. Environmental Protection Agency,* 843 F.2d 782, 788 (4th Cir. 1988). The "zone of interest" requirement is designed "to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives." *Clarke v. Securities Industry Association,* 479 U.S. 388, 397 n. 12, 107 S.Ct. 750, 756 n. 12, 93 L.Ed.2d 757 (1987).

Accordingly, plaintiff must allege that its injury is within the zone of interests protected by NEPA. In enacting NEPA, Congress intended "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321; *Nevada Land Action Association v. United States Forest Service,* 8 F.3d 713, 716 (9th Cir.1993). Courts have uniformly held that a plaintiff who asserts solely economic injury lacks standing to challenge an agency action under NEPA. *See Nevada Land Action,* 8 F.3d at 716; *Competitive Enterprise Institute v. National Highway Traffic Safety Administration,* 901 F.2d 107, 123–24 (D.C.Cir.1990); *Portland Audubon Society v. Hodel,* 866 F.2d 302, 309 (9th Cir.), *cert. denied,* 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989); *Panhandle Producers & Royalty Owners Association v. Economic Regulatory Administration,* 847 F.2d 1168, 1179 (5th Cir.1988); *Port of Astoria v. Hodel,* 595 F.2d 467, 475 (9th Cir.1979); *Churchill Truck Lines, Inc. v. United States,* 533 F.2d 411, 416 (8th Cir.1976); *Clinton Community Hospital Corporation v. Southern Maryland Medical Center,* 510 F.2d 1037, 1038 (4th Cir.), *cert. denied,* 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975); *Organized Fishermen of Florida v. Watt,* 590 F.Supp. 805, 815 (S.D.Fla.1984), *aff'd,* 775 F.2d 1544 (11th Cir. 1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986); *see also* 40 C.F.R. § 1508.14 ("economic or social effects are not intended by themselves to require preparation of an environmental impact statement").

■ Since plaintiff has alleged no injury beyond the economic losses incurred as a result of the "grounding" of the Mister Big, the court is compelled to conclude that plaintiff has not suffered any injury within the zone of interests protected by NEPA and, thus, does not have standing to challenge the Secretary's action under NEPA. Additionally, the court would be justified in holding that plaintiff is not entitled to summary judgment on its NEPA claim because it failed to plead such a claim in its complaint. *See United States v. Weiss,* 847 F.Supp. 819, 825 (D.Nev.1994) ("defendant is not required to address an argument based upon a claim that was never pled"). Plaintiff failed to put defendant on notice that the NEPA claim would be pursued, and accordingly, fundamental fairness dictates that plaintiff cannot

prevail on its summary judgment motion with respect to that claim.

Thus, as plaintiff lacks standing to assert a NEPA violation, the court will not address the merits of the Secretary's decision to file a FONSI rather than an EIS.[4] Suffice it to say, plaintiff, based on its lack of standing, is not entitled to have the Secretary's decision overturned due to non-compliance with NEPA.

## COMPLIANCE WITH EXECUTIVE ORDER 12866

Lastly, plaintiff challenges the emergency rule as violative of Executive Order 12866. E.O. 12866 requires that the Office of Management and Budget review proposed "significant regulatory action." Pursuant to pertinent guidelines, a significant regulatory action is one that may:

(1) have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities.

58 Fed.Reg. 51735. Plaintiff disputes the conclusion that the executive order was not implicated because the closure decision was not a "significant regulatory action." Plaintiff contends that the temporary closure of the scallop fishery must result in some adverse material impact on the subject economies and communities.

Plaintiff's contentions do not merit discussion. Section 10 of E.O. 12866, titled "Judicial Review," reads as follows:

Nothing in this Executive order shall affect any otherwise available judicial review of agency action. This Executive order is intended only to improve the internal management of the Federal Government and *does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person* (emphasis added).

Accordingly, plaintiff has no right of action to challenge the Secretary's compliance with E.O. 12866. *See State of Michigan v. Thomas,* 805 F.2d 176, 187 (6th Cir.1986) (interpreting same language as precluding judicial review of E.O. 12291). Moreover, the emergency rule does not constitute significant regulatory action so as to render it subject to the requirements of the executive order.

## CONCLUSION

The court is persuaded that an emergency situation existed following the Mister Big's escapade into the federal waters off the coast of Alaska and that the Secretary acted rationally to solve the problem. The Secretary's decision to close temporarily the scallop fishery was not tainted or materially affected by procedural irregularity. Moreover, there is no other reason to set aside the Secretary's decision. The emergency rule does not contravene the dictates of the National Standards and plaintiff is barred from challenging the emergency rule as violative of NEPA and E.O. 12866. Accordingly, plaintiff's motion for summary judgment will be denied, and defendant's granted.

Judgment embodying the rulings in this memorandum will be entered.

4. The court notes, however, that there appears to be no evidence of record which would undermine the reasonableness of the Secretary's decision not to prepare an EIS.