**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED COOK INLET DRIFT
ASSOCIATION; COOK INLET
FISHERMEN'S FUND,
　　　　　*Plaintiffs-Appellants*,

v.

NATIONAL MARINE FISHERIES
SERVICE; PENNY PRITZKER, in
her official capacity as Acting
United States Secretary of
Commerce; KATHRYN
SULLIVAN, Acting Under
Secretary of Commerce and
Administrator for the National
Oceanic and Atmospheric
Administration; JAMES W.
BALSIGER, in his official
capacity as NMFS Alaska
Region Administrator,
　　　　　*Defendants-Appellees*,

STATE OF ALASKA,
　　　　　*Intervenor-Defendant-*
　　　　　　　　*Appellee.*

No. 14-35928

D.C. No.
3:13-cv-00104-TMB

OPINION

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, Chief Judge, Presiding

Argued and Submitted August 2, 2016
Anchorage, Alaska

Filed September 21, 2016

Before:  Raymond C. Fisher, Richard A. Paez,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz

## SUMMARY[*]

### Magnuson-Stevens Fishery Conservation and Management Act

The panel reversed the district court's summary judgment in favor of the government in an action under the Magnuson-Stevens Fishery Conservation and Management Act brought by two groups of commercial fishermen urging the rejection of Amendment 12, which removed the historic net-fishing area of Cook Inlet from the Salmon Fishery Management Plan ("FMP"); and remanded with instructions that judgment be entered in favor of plaintiffs.

The panel held that the National Marine Fisheries Service cannot exempt a fishery under its authority that required conservation and management from an FMP because the agency is content with State management. The panel held that the Magnuson-Stevens Act unambiguously

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

requires a Regional Fishery Management Council to create an FMP for each fishery under its authority that requires conservation and management. The panel further held that the Magnuson-Stevens Act allowed delegation to a state under the FMP, but did not excuse the obligation to adopt an FMP when a Regional Fishery Management Council opted for state management. The panel concluded that Amendment 12 was therefore contrary to law to the extent that it removed Cook Inlet from the FMP.

## COUNSEL

Jason T. Morgan (argued) and Beth S. Ginsberg, Stoel Rives LLP, Seattle, Washington, for Plaintiffs-Appellants.

Ellen J. Durkee (argued) and Coby Howell, Attorneys, Appellate Section; John C. Cruden, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Caroline Park, NOAA Office of the General Counsel, Silver Spring, Maryland; Lauren Smoker, NOAA Office of the General Counsel, Department of Commerce, Juneau, Alaska; for Defendants-Appellees.

Seth M. Beausang (argued), Assistant Attorney General, Anchorage, Alaska, for Intervenor-Defendant-Appellee.

**OPINION**

HURWITZ, Circuit Judge:

The Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–91 ("Magnuson-Stevens Act," or "the Act"), creates a "national program for the conservation and management of the fishery resources of the United States." *Id.* § 1801(a)(6). The Act establishes eight Regional Fishery Management Councils, each of which "shall" prepare a fishery management plan ("FMP") "for each fishery under its authority that requires conservation and management." *Id.* § 1852(a), (h)(1). The Secretary of Commerce, acting through the National Marine Fisheries Service ("NMFS"), then reviews each FMP or amendment of a plan "to determine whether it is consistent with the [Act's] national standards, the other provisions of this chapter, and any other applicable law," 16 U.S.C. § 1854(a)(1). *See Or. Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1108 (9th Cir. 2006).

The issue for decision is whether NMFS can exempt a fishery under its authority that requires conservation and management from an FMP because the agency is content with State management. The district court held that it could. We disagree, and reverse.

**BACKGROUND**

**I.  Factual and Legislative Background**

Cook Inlet is one of the nation's most productive salmon fisheries. Its salmon are anadromous, beginning their lives in Alaskan freshwater, migrating to the ocean, and returning to freshwater to spawn.

In 1953, the United States entered into the International Convention for the High Seas Fisheries of the North Pacific Ocean. In response, Congress enacted the North Pacific Fisheries Act of 1954 (the "1954 Act"), authorizing the Secretary of the Interior to promulgate regulations governing fisheries contiguous to Alaskan waters. *See* Pub. L. No. 83-579, §§ 10 & 12, 68 Stat. 698, 699–700 (previously codified at 16 U.S.C. §§ 1021–35). The Secretary then issued a regulation prohibiting salmon net fishing in the western waters of Alaska, but excepting Cook Inlet and two other areas where net fishing had historically been permitted under Alaska law; in those areas, federal regulation was to mirror existing Alaskan regulation. 50 C.F.R. § 210.10 (repealed).

Before 1976, the United States asserted authority only over waters up to twelve nautical miles from the coastline, and there was substantial concern that foreign fishers were depleting American fisheries. *See* Mark H. Zilberberg, *A Legislative History of the Fishery Conservation & Management Act of 1976* ("Legislative History") 237–41, 352, 448–49, 455–56, 472–73, 476–81, 519 (1976). In 1976, Congress enacted the Fishery Conservation and Management Act (the "1976 Act"), Pub. L. No. 94-265, 90 Stat 331 (codified as amended at 16 U.S.C. §§ 1801–1891), later renamed the Magnuson-Stevens Act. The 1976 Act extended federal jurisdiction to 200 miles from the coastline, *id.* § 101 (codified as amended at 16 U.S.C. § 1811), and regulated foreign fishing in that area, *id.* §§ 201, 204 (codified as amended at 16 U.S.C. §§ 1821, 1824). States retained jurisdiction over the first three miles from the coast, *id.* § 306(a) (codified as amended at 16 U.S.C. § 1856), and the federal government had jurisdiction over the next 197 miles, originally called the fishery conservation zone ("FCZ") and later named the exclusive economic zone ("EEZ"), *id.* § 101 (codified as amended at 16 U.S.C.

§ 1811). *See also* 16 U.S.C. § 1801(b)(1); *Exclusive Economic Zone of the United States of America*, 48 Fed. Reg. 10,605 (Mar. 10, 1983).

The federal government manages its waters through eight regional Councils. 16 U.S.C. § 1852. During the debate on the 1976 Act, Senator Gravel of Alaska criticized the concept of federal management on one side of the three-mile line and state management on the other, because fish freely travel across the three-mile boundary. Legislative History 412–13, 460–67. Senator Gravel suggested that a state should manage its federal waters under a plan approved by the federal government. *Id.* at 467, 471. Senator Stevens of Alaska, one of the bill's managers, offered an even broader proposal, which provided for exclusive state management of "[t]hose fisheries capable of being managed as a unit, which reside principally within the waters of a single State." *Id.* at 422. But, Congress instead approved a more modest substitute offered by the bill's other manager, Senator Magnuson, directing Councils, if possible, to incorporate state management measures in FMPs. *Id.*; 1976 Act § 305(c) (codified at 16 U.S.C. § 1855).

In 1979, NMFS promulgated an FMP for salmon fisheries near Alaska. *See* Fishery Management Plan for the High Seas Salmon, 44 Fed. Reg. 33,250 (June 8, 1979) (the "Salmon FMP"). The Salmon FMP divided Alaskan federal waters into East and West Areas; Cook Inlet is in the West Area. *Id.* at 33,267. With respect to the West Area, the FMP tracked the regulations promulgated under the 1954 Act prohibiting commercial salmon fishing except in the three historic net-fishing areas, including Cook Inlet, which the State would continue to manage. *Id.* ("These fisheries are technically in the FCZ, but are conducted and managed by the State of Alaska as inside fisheries."). The decision to

leave these fisheries in the hands of the State was not based on a finding that they were in good health; to the contrary, the Salmon FMP found that "[a]ll salmon species are at historic low levels in the Cook Inlet management area, with chinook stocks seriously depleted." *Id.* at 33,309.

In 1983, Congress amended the Act to specify that a Council need only prepare an FMP with respect to a fishery "that requires conservation and management." Pub. L. No. 97-453, § 5(4), 96 Stat. 2481, 2486 (codified as amended at 16 U.S.C. § 1852(h)(1)). The conference report explained this amendment was intended "to clarify that the function of the Councils is not to prepare a fishery management plan (FMP) for each and every fishery within their geographical areas of authority. Rather, such plans are to be developed for those fisheries which require conservation and management." H.R. Conf. Rep. No. 97-982, 97th Cong., 2d Sess., at *18.

Alaska had proposed to amend the Act "to direct the Secretary of Commerce to delegate authority of a domestic fishery in the FCZ to the adjacent state . . . if . . . 1) the fishery does not cross interstate boundaries; and 2) the State is capable and willing to provide conservation and management consistent with the National Standards." *Omnibus Authorization Bill for the National Oceanic and Atmospheric Administration: Hearings Before the S. Comm. on Commerce, Sci. & Transp.*, Serial No. 97-118, 97 Cong. 310 (1982) [hereinafter *Hearings*] (statement of Ronald O. Skoog, Commissioner, Alaska Department of Fish and Game). But, this proposal was not enacted. *See* Pub. L. No. 97-453, § 5(4), 96 Stat. 2481, 2486 (1982).

The Salmon FMP was revised in 1990. The revised FMP stated that, under the regulation implementing the 1954 Act, 50 C.F.R. § 210, salmon net fishing in the West Area was

prohibited, with the exception of the three historic net-fishing areas, which "technically extend into the EEZ, but . . . are conducted and managed by the State of Alaska as nearshore fisheries."

In 1992, a new international convention prohibited all fishing for anadromous fish beyond the EEZ. Convention for the Conservation of Anadromous Stocks in the North Pacific Ocean, art. I, III. Congress promptly implemented that convention and repealed the 1954 Act. North Pacific Anadromous Stocks Act of 1992, Pub. L. No. 102-567, §§ 801–14, 106 Stat. 4309 (codified at 16 U.S.C. §§ 5001–5012). The Secretary of Commerce then concluded that regulations promulgated under the 1954 Act, including 50 C.F.R. § 210, no longer had statutory support, and repealed them. Removal of Regulations, 60 Fed. Reg. 39,271, 39,272 (Aug. 2, 1995). But, the Salmon FMP was not revised, and Alaska continued to manage the three historic net fisheries.

In 1995, a fishing vessel, "Mister Big," engaged in a massive unregulated harvest of scallops in the federal waters of Prince William Sound. *See Trawler Diane Marie, Inc. v. Brown*, 918 F. Supp. 921 (E.D.N.C. 1995). That scallop fishery was not covered by an FMP, but the Magnuson-Stevens Act provided that a State could regulate fishing vessels in federal waters that were registered in that state. *Id.* at 924, 926; *see* Pub. L. No. 98-623, § 404(4), 98 Stat. 3394, 3408 (1984) ("[A] State may not directly or indirectly regulate any fishing vessel outside its boundaries, unless the vessel is registered under the law of that State."). The Mister Big set sail from Seattle, renounced its Alaska registration, and began fishing for scallops in the Sound. *Trawler Diane Marie*, 918 F. Supp. at 924. By January 26, 1995, the quota that Alaska set for the area, 50,000 pounds of scallops, had

been harvested, so Alaska closed the scallop season and Alaska-registered boats returned home. *Id.* But, the Mister Big continued to dredge, eventually harvesting 52,000 pounds of scallops before the Secretary of Commerce approved an emergency closure of the fishery. *Id.* at 925, 927. The North Pacific Council had drafted an FMP which addressed the possibility that an unregulated vessel might fish for scallops in the federal waters off Alaska, but had not adopted it "because of the belief that all vessels fishing in the EEZ would be registered in Alaska and thus bound by the state's regulations." *Id.* at 926.

The following year, Congress revised the provision regarding state authority to regulate fishing vessels in federal waters. *See* Sustainable Fisheries Act, Pub. L. No. 104-297, § 112, 110 Stat. 3559, 3595–97 (1996). After that amendment, the Magnuson-Stevens Act now provides, in relevant part:

> A State may regulate a fishing vessel outside the boundaries of the State in the following circumstances:
>
> (A) The fishing vessel is registered under the law of that State, and (i) there is no fishery management plan or other applicable Federal fishing regulations for the fishery in which the vessel is operating; or (ii) the State's laws and regulations are consistent with the fishery management plan and applicable Federal fishing regulations for the fishery in which the vessel is operating.
>
> (B) The fishery management plan for the fishery in which the fishing vessel is operating delegates management of the

fishery to a State and the State's laws and regulations are consistent with such fishery management plan.

16 U.S.C. § 1856(a)(3).  The version of the bill reported out of the House Committee on Resources would have authorized Alaska to enforce its regulations in federal waters even absent an FMP.  H.R. Rep. No. 104-171, at *11–12 (1995).  But, that version was not enacted.  Pub. L. No. 104-297, § 112.

## II.  Amendment 12

The North Pacific Council has jurisdiction over the federal waters of Cook Inlet.  Six of its 11 voting members are from Alaska and the remainder are from Washington and Oregon.  16 U.S.C. § 1852(a)(1)(G), (b)(1), (b)(2)(C).

In 2010, the North Pacific Council began a comprehensive review of the Salmon FMP.  As a result, NMFS "realized" that Cook Inlet was "not exempt from the FMP as previously assumed."  Council staff prepared a discussion paper, which summarized the situation as follows:

> The FMP is vague on the function of the FMP in these areas.  Though the FMP broadly includes these three areas and the salmon and fisheries that occur there within the fishery management unit and states that management of these areas is left to the State under other Federal law, the FMP does not explicitly defer management of these salmon fisheries to the State.  The FMP does not contain any management goals or objectives for these three areas or any provisions with which to

> manage salmon fishing. The FMP only refrains from extending the general fishing prohibition to those areas, where, as the FMP notes, fishing was authorized by other Federal law, [which has since been repealed]. Therefore, the FMP's reference to "other Federal laws" may no longer be fully effective.

The North Pacific Council circulated a draft Environmental Assessment, held five public meetings, and took testimony. In 2011, the North Pacific Council unanimously voted to remove the three historic net fishing areas from the Salmon FMP. In April 2012, NMFS solicited comments on this change, "Amendment 12," and proposed implementing regulations. 77 Fed. Reg. 19,605 (Apr. 2, 2012); 77 Fed. Reg. 21,716 (Apr. 11, 2012).

Two groups of commercial fishermen, the United Cook Inlet Drift Association and the Cook Inlet Fishermen's Fund (collectively, "United Cook"), submitted comments urging the rejection of Amendment 12. The comments cited a 51% decline since 1981 in the commercial catch of sockeye salmon. United Cook attributed this decline to two management failures by Alaska. First, United Cook argued that the State had failed to address the introduction of carnivorous northern pike into nearby lakes and streams. Second, United Cook argued that Alaska was not properly managing the escapement of salmon in Cook Inlet. The Magnuson-Stevens Act requires limits on the number of fish caught. 16 U.S.C. § 1853(a)(15). In contrast, Alaska manages commercial salmon fishing through escapement goals, *i.e.*, the number of salmon allowed to "escape" past a fishery to spawn. According to United Cook, "the State misses the high end of its escapement goal targets as much

as 35% of the time," leading to a massive unharvested supply of fish, and "has no escapement goals at all for many runs in Cook Inlet."

In June 2012, NMFS issued a final Environmental Assessment, finding that "the State is the appropriate authority for managing Alaska salmon fisheries given the State's existing infrastructure and expertise," and that "the State's escapement based management system is a more effective management system for preventing overfishing than a system [like the federal one] that places rigid numeric limits on the number of fish that may be caught." NMFS also issued a finding that Amendment 12 would have no significant impact on the environment because it would not change the management of the fisheries. NMFS approved Amendment 12, and, in December 2012, promulgated implementing regulations. *See* Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Salmon, 77 Fed. Reg. 75,570 (Dec. 21, 2012); 50 C.F.R. § 679.2 (definition of West Area).

## III.    Procedural Background

United Cook filed this action in 2013, challenging Amendment 12 and its implementing regulations as contrary to the Magnuson-Stevens Act's requirement that a Council prepare an FMP "for each fishery under its authority that requires conservation and management," 16 U.S.C. § 1852(h)(1). United Cook also alleged that Amendment 12 was arbitrary and capricious and contrary to the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C). The district court granted Alaska's motion to intervene as a defendant, and entered summary judgment for the government. United Cook timely appealed.

**DISCUSSION**

The Magnuson-Stevens Act requires that "[e]ach Council shall, in accordance with the provisions of this chapter—(1) for each fishery under its authority that requires conservation and management, prepare and submit to the Secretary (A) a fishery management plan . . . ." 16 U.S.C. § 1852(h)(1). Thus, the usual initial question is whether the fishery at issue even needs conservation and management. *See Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 114–15 (D.D.C. 2015). We review that administrative decision under the traditional arbitrary and capricious standard. *Id.* But we need not tarry over that issue here; the government concedes that the Cook Inlet fishery requires conservation and management.

But, the government argues that the Act only requires an FMP for fisheries that need *federal* conservation and management, and that Cook Inlet is in good hands with Alaska. The district court found the Act ambiguous, gave *Chevron* deference to the government's interpretation, and found not arbitrary and capricious the agency's decision that federal involvement was not necessary.

We determine whether to afford *Chevron* deference to an agency interpretation of a statute under a two-step analysis. First, we consider "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter." *Id.* Only "if the statute is silent or ambiguous with respect to the specific issue," do we go to step two, which considers "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

"We start, as always, with the language of the statute." *Williams v. Taylor*, 529 U.S. 420, 431 (2000). Section 1852(h)(1) of the Act provides that a Council "shall" prepare an FMP for a fishery (1) "under its authority" that (2) requires "conservation and management." The government concedes that Cook Inlet is a fishery under its authority that requires conservation and management. But it argues that an FMP is only mandated by the Act when "federal" conservation and management is required. Thus, the government asks us to insert the word "federal" into § 1852(h)(1) before the phrase "conservation and management."

"[W]e ordinarily resist reading words or elements into a statute that do not appear on its face," *Bates v. United States*, 522 U.S. 23, 29 (1997), and the government never persuasively explains why we should deviate from that rule here. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1095 (9th Cir. 2012) (rejecting a reading of the Magnuson-Stevens Act which "requires inserting the word 'only' or 'solely' into subsection [1853a](c)(5)"); *see also Stanton Rd. Assocs. v. Lohrey Enters.*, 984 F.2d 1015, 1020 (9th Cir. 1993) (stating that courts "lack . . . power" to "read into the statute words not explicitly inserted by Congress"). In arguing that we should insert the word "federal" into § 1852(h)(1), the government relies heavily on what it calls the "deferral" provision of the Act, § 1856(a)(3)(A)(i), which allows a state to regulate state-licensed vessels in federal waters when no FMP exists. The government argues that this provision assumes that NMFS can cede regulatory authority to a state over federal waters that require conservation and management simply by declining to issue an FMP. But, § 1856(a)(3)(A)(i) does not create an exception to the general obligation to issue an FMP when a fishery requires conservation and management;

rather, the provision only restates the longstanding principle that a State can regulate vessels registered under its laws in federal waters absent federal law to the contrary. This principle dates at least to 1976. *See* 1976 Act § 306(a) ("No State may directly or indirectly regulate any fishing which is engaged in by any fishing vessel outside its boundaries, unless such vessel is registered under the laws of such State.").

The 1996 amendment to the Magnuson-Stevens Act did not expand that traditional state authority, but rather *limited* state jurisdiction over state-registered vessels to when (i) there is no FMP, or (ii) state law is consistent with the FMP. *See* Sustainable Fisheries Act, § 112 (codified at 16 U.S.C. § 1856(a)(3)(A)). This "deferral provision" would be a strange form of delegation of federal regulatory authority, as it does not allow states to regulate vessels registered in other states. In contrast, the next paragraph of the 1996 amendments, the so-called "delegation" provision, expressly authorizes NMFS to "delegate[ ] management of the fishery to a State" through an FMP, at which point the state can regulate any fishing vessel in the federal waters at issue, regardless of registration. *Id.* (codified at 16 U.S.C. § 1856(a)(3)(B)).

The Act is clear: to delegate authority over a federal fishery to a state, NMFS must do so expressly in an FMP. 16 U.S.C. § 1856(a)(3)(B). If NMFS concludes that state regulations embody sound principles of conservation and management and are consistent with federal law, it can incorporate them into the FMP. *Id.* § 1853(b)(5). Indeed, Amendment 12 expressly delegates management of the East Area – certain federal waters off Alaska not including Cook Inlet – to Alaska. Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Salmon, 77 Fed. Reg. at 75,570–71;

50 C.F.R. §§ 679.1(i)(2) ("State of Alaska laws and regulations that are consistent with the Salmon FMP and with the regulations in this part apply to vessels of the United States that are commercial and sport fishing for salmon in the East Area of the Salmon Management Area."), 679.3(f). Amendment 12 could have expressly delegated management of Cook Inlet to Alaska as well, but it did not.  The government argues removing Cook Inlet from the FMP amounts to delegation.  But, the federal government cannot delegate management of the fishery to a State without a plan, because a Council is required to develop FMPs for fisheries within its jurisdiction requiring management and then to manage those fisheries "through" those plans.  16 U.S.C. §§ 1801(b)(4)–(5), 1852(h)(1).  The "deferral" provision covers those waters where for some reason a plan is not in effect; it is not an invitation to a Council to shirk the statutory command that it "shall" issue an FMP for each fishery within its jurisdiction requiring conservation and management.

Although we find the statutory language clear, we also note that the legislative history of the Act belies the government's argument.[1]  The Act makes plain that federal fisheries are to be governed by federal rules in the national interest, not managed by a state based on parochial concerns. *Compare* 16 U.S.C. §§ 1801(a)(6) ("A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing . . . and to realize the full potential of the Nation's fishery

---

[1]  "[W]e 'cautiously adhere' to the practice of consulting legislative history" at step one of a *Chevron* analysis, *Irvine Med. Ctr. v. Thompson*, 275 F.3d 823, 829 n.3 (9th Cir. 2002) (quoting *Am. Rivers v. Fed. Energy Reg. Comm'n*, 201 F.3d 1186, 1196 n.16 (9th Cir. 2000)), recognizing that "courts have no authority to enforce a principle gleaned solely from legislative history that has no statutory reference point," *Shannon v. United States*, 512 U.S. 573, 584 (1994) (alterations omitted).

resources.") and 1802(33)(A) ("The term 'optimum', with respect to the yield from a fishery, means the amount of fish which—(A) will provide the greatest overall benefit to the Nation.") and 1811(a) ("[T]he United States claims, and will exercise in the manner provided for in this chapter, sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone.") *with* Alaska Br. 13 ("The Alaska Constitution requires the State to manage natural resources for the maximum benefit and use for all Alaskans." (citing Alaska Const. art. VIII, §§ 1–2)).   Congress therefore repeatedly rejected proposals to provide for state management of federal fisheries without an FMP.  *Compare* Legislative History 422, 467, 471, *with* 1976 Act § 305(c); *compare Hearings*, *supra*, at 310, *with* Pub. L. No. 97-453, § 5(4) (1982); *compare* H. Rep. No. 104-171 at *11–12, *with* Pub. L. No. 104-297, § 112 (1996).   We decline the government's invitation to vest in Alaska the very authority that Congress abjured.

Alaska argues that NMFS has discretion not to adopt an FMP for federal waters requiring management and conservation, because "shall" sometimes means "may."  *See Sierra Club v. Whitman*, 268 F.3d 898, 904 (9th Cir. 2001). But, that is not the general rule; we recognized in *Sierra Club* that "'shall' in a statute generally denotes a mandatory duty." *Id.*; *see also United States v. Monsanto*, 491 U.S. 600, 607 (1989) (stating that by using "shall," "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory"); *Brower v. Evans*, 257 F.3d 1058, 1067 n.10 (9th Cir. 2001) ("'Shall' means shall." (quoting *Ctr. for Biological Diversity v. Norton*, 254 F.3d 833, 837–38 (9th Cir. 2001))).   Our holding in *Sierra Club* that the Environmental Protection Agency did not have a mandatory duty to bring enforcement actions under the Clean Water Act

was driven by "the traditional presumption that an agency's refusal to investigate or enforce is within the agency's discretion," and based on an "[a]nalysis of the structure and the legislative history of the Clean Water Act."  268 F.3d at 902, 904.  No similar factors here support reading "shall" as "may."[2]

The government argues that § 1852(h)(1) does not expressly require an FMP to cover an entire fishery, noting that "the provision says nothing about the geographic scope of plans at all."  But, the statute requires an FMP for a fishery, a defined term.  *See* 16 U.S.C. § 1802(13).  No one disputes that the exempted area of Cook Inlet is a salmon fishery.  But, under the government's interpretation, it could fulfill its statutory obligation by issuing an FMP applying to only a single ounce of water in that fishery.  We disagree. When Congress directed each Council to create an FMP "for each fishery under its authority that requires conservation and management," *id.* § 1852(h)(1), it did not suggest that a Council could wriggle out of this requirement by creating

---

[2]  Alaska also argues that, if we fail to add the word "federal" before "conservation and management" in § 1852(h)(1), NMFS will be forced to issue an FMP for every fishery, because all fisheries require some conservation and management.  However, the legislative history of the Act directly refutes this argument.  A previous version of the statute required an FMP for every fishery under a Council's authority.  In 1983, Congress amended the statute to specify that an FMP is necessary only where a fishery "requires conservation and management."  Pub. L. No. 97-453 § 5(4), 96 Stat. 2481, 2486 (codified as amended at 16 U.S.C. § 1852(h)(1)).  If every fishery required some type of conservation and management, this amendment would amount to a nullity.  But, "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397–98 (1995)).  The amendment thus indicates Congress understood that some fisheries might not require conservation or management.

FMPs only for selected parts of those fisheries, excluding other areas that required conservation and management.  *See id.* § 1853(a) (setting out the required contents of FMPs).**[3]**

Finally, the government argues that its interpretation is supported by National Standards 3 and 7 in the Magnuson-Stevens Act, 16 U.S.C. § 1851(a)(3), (7), and the implementing guidelines for those standards, 50 C.F.R. §§ 600.305–355.  But, the National Standards only govern the *contents* of an FMP, not the decision whether to issue one.  *See* 16 U.S.C. § 1851(a) (requiring that FMPs "be consistent with the following national standards for fishery conservation and management").    The government's advisory guidelines fare no better, as they do not have the force of law.  *Id.* § 1851(b).

## CONCLUSION

The Magnuson-Stevens Act unambiguously requires a Council to create an FMP for each fishery under its authority that requires conservation and management.  The Act allows delegation to a state under an FMP, but does not excuse the

---

**[3]**  The government also appears to argue that it fully discharged its statutory obligation when the Salmon FMP was adopted in 1990, because the FMP included Cook Inlet (albeit by placing it under Alaska's authority), and that it was thereafter free under the Act to remove any parts of the West Area from the FMP.  But, removing a fishery from an FMP is no different than excluding that fishery from the start.  An amendment to an FMP, like the FMP itself, must conform to the statutory scheme.  *See* 16 U.S.C. §§ 1852(h)(1) ("Each Council shall . . . prepare and submit to the Secretary . . . (B) amendments to each such plan that are necessary."); 1854(a)(1) (requiring the Secretary to review an FMP amendment "to determine whether it is consistent with the national standards, the other provisions of this chapter, and any other applicable law").

obligation to adopt an FMP when a Council opts for state management.  Amendment 12 is therefore contrary to law to the extent it removes Cook Inlet from the FMP.[4]  We reverse the judgment of the district court and remand with instructions that judgment be entered in favor of United Cook.

**REVERSED and REMANDED.**

---

[4]  Because Congress has spoken clearly, we need not reach *Chevron* step two.  And, because we conclude that Amendment 12 is contrary to law with respect to its removal of Cook Inlet from the FMP, we need not address United Cook's other challenges to the Amendment.