SOUTHERN OFFSHORE FISHING
ASSOCIATION, et al.,
Plaintiffs,

v.

William M. DALEY, Defendant.

No. 97–1134–CIV–T–23C.

United States District Court,
M.D. Florida,
Tampa Division.

Feb. 24, 1998.

Charles Paul Schropp, Schropp, Buell & Elligett, P.A., Tampa, FL, David E. Frulla, Brand, Lowell & Ryan, P.C., Washington, DC, for Southern Offshore Fishing Assoc., Directed Shark Fishery Assoc., Seafood Atlantic, Inc., Fishermen's Ice and Bait, Inc., Harrison Int'l, Enterprises, Inc., Willie R. Etheridge Seafood Co., Inc., Tristram Colket, Harold West, Bruce Stiller, and Glen Hopkins.

Mark A. Brown, Wildlife & Marine Resources Section, Environment & Natural Resources Div., Washington, DC, Mariam McCall, NOAA GCF, Silver Spring, MD, for William M. Daley, Secretary of Commerce.

Cody Fowler Davis, Macfarlane, Ferguson & McMullen, Tampa, FL, Colin C. Deihl, Dawn McKnight, Mark Hughes, Earthlaw, University of Denver School of Law, Foote Law, Denver, CO, for Center for Marine Conservation, National Audubon Society, Inc., Natural Resources Defense Council, Inc., Biodiversity Legal Foundation, Amici Curiae.

### ORDER

MERRYDAY, District Judge.

The plaintiffs, a coalition of shark fishermen and shark fishing organizations, challenge the 1997 commercial harvest quotas imposed by the United States Secretary of Commerce and his designees ("Secretary") for the capture of Atlantic sharks currently under federal management. The plaintiffs allege that the administrative decision is unsupported by the record and is contrary to law. I conclude that the Secretary acted within his regulatory discretion in setting the quotas but failed to conduct a proper analysis to determine the quotas' economic effect on small businesses.

### The Atlantic Shark Fishery

At least 73 shark species inhabit the Atlantic coast of the United States, the Gulf of Mexico, and the Caribbean Sea. U.S. fishermen harvest (the prevalent euphemism for commercial and sports fishing) sharks both recreationally and commercially. Although small, localized shark fisheries have existed along all U.S. coasts for many years, shark fishing has increased in recent years as domestic and international markets expanded *pari passu* with increases in demand for sundry shark products, including fins, meat, and hides. In the 1970's and 1980's the U.S. government actively promoted commercial exploitation of the Atlantic shark fishery. The government's objective was to develop a presumably "underutilized resource" and to relieve the acute fishing pressure on more commercially popular fish stocks. Fishermen, including some of the individual plaintiffs in this case, undertook commercial shark fishing in the 1980's as a result of the government's promotional efforts.

"Directed shark fishing vessels"—boats purchased, equipped, and operated chiefly for commercial shark fishing—are usually small (45 feet or less in length) compared to typical commercial fishing vessels. The shark fishery became a "small boat" fishery when in 1994 the imposition of a strict 4,000 pound per trip limit rendered fishing by larger vessels economically unfeasible. Often owned and operated by individuals, directed vessels are sailed by small crews, yield only frail profits, and venture into U.S. waters only. A few self-employed fishermen, includ-

ing some parties to this case, devote a large portion of their commercial efforts to the capture of Atlantic shark species, especially large coastal sharks. Other vessels harvest sharks as an incident to their pursuit of other Atlantic migratory species, including tuna and swordfish. Unlike the directed shark vessels, the larger, oceanic vessels range far beyond U.S. waters.

In February, 1997, 1,598 U.S. vessels were licensed to commercially harvest sharks in the Atlantic Ocean and the Gulf of Mexico. Recent increases in commercial shark fishing have not decreased the popularity of recreational shark fishing, a venturesome, rigorous, and often competitive diversion for some sportsmen.

Before July, 1993, most data on shark landings were submitted voluntarily to the Secretary and to states by fishermen who recorded the weight of dressed carcass and average prices of sharks purchased by seafood dealers.[1] Other sources of commercial catch data included voluntary logbooks that recorded the dressed weight of individual fish. Estimates of commercial landings were based on the number of boats identified as targeting coastal sharks. Further, telephone interviews and surveys of anglers at selected fishing sites provided data on recreational shark fishing.

U.S. fishermen share the Atlantic shark resource with fishermen from Mexico, Cuba, Nicaragua, and other countries bordering the Gulf of Mexico, the Caribbean Sea, and the southwestern waters of the North Atlantic Ocean. Foreign commercial shark fishing into stocks adjoining the U.S. preceded federal government efforts to develop the U.S. commercial shark fishery.

### Fishery Management

Through the Magnuson–Stevens Fishery Conservation and Management Act, as recently amended and renamed by the Sustainable Fisheries Act of 1996, 16 U.S.C. §§ 1801, *et seq.* (the "Magnuson Act"), Congress delegated to the Secretary "broad authority to manage and conserve coastal fisheries." *Kramer v. Mosbacher,* 878 F.2d 134, 135 (4th Cir.1989). To assist the Secretary in carrying out specific management and conservation duties, the Magnuson Act created five independent regional fishery management councils. A council's "principal task is to prepare fishery management plans [("plans")] for its area." *Id.* However, the council system is inapplicable to species that the statute considers "highly migratory." The Magnuson Act assigns the responsibility to prepare and implement plans for Atlantic sharks, as "highly migratory species," exclusively to the Secretary. 16 U.S.C. § 1854(g).

The Secretary's authority and discretion with respect to the management of Atlantic sharks are not unfettered. In preparing, amending, and implementing an FMP under the Magnuson Act, the Secretary must consider various competing factors aimed at promoting conservation and protecting the fishing industry. *See* 16 U.S.C. § 1854(g)(1).[2]

---

**1.** Because the heads, entrails, and fins are typically removed at sea, shore-side landing data fall to provide the individual length, sex, approximate age, or species composing each catch.

**2.** Section 1854(g)(1) of the statute prescribes the following relevant considerations:

> In preparing and implementing any ... plan or amendment, the Secretary shall—

> . . . . .

> (C) evaluate the likely effects, if any, of conservation and management measures on participants in the affected fisheries and minimize, to the extent practicable, any disadvantage to

United States fishermen in relation to foreign competitors;

> . . . . .

> (E) review, on a continuing basis (and promptly whenever a recommendation pertaining to fishing for highly migratory species has been made under a relevant international fishery agreement), and revise as appropriate, the conservation and management measures included in the plan;

> (F) diligently pursue, through international entities (such as the International Commission for the Conservation of Atlantic Tunas), comparable international fishery management measures with respect to fishing for highly migratory species; and

> (G) ensure that conservation and management measures under this subsection—

In addition, all of the Secretary's regulatory actions must be consistent with the ten national standards for fishery conservation and management prescribed by § 1851(a), which, like § 1854(g)(1), requires the Secretary to account for competing environmental and economic considerations.[3] Finally, the Secretary must also comply with the Regulatory Flexibility Act, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. §§ 601, *et seq.* (the "RFA"), which requires an agency in the process of rule-making to consider the effect of the agency's proposed regulation on small enterprises and to prescribe pertinent mitigating measures. Both the Magnuson Act and the RFA provide for judicial review of the Secretary's actions pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq.* ("APA"). *See* 16 U.S.C. § 1855(f); 5 U.S.C. § 611(a)(1).

On February 25, 1993, the Secretary's designee, the National Marine Fishery Service ("NMFS"), issued the "Fishery Management Plan for Sharks of the Atlantic Ocean" (the "FMP"), governing the Atlantic shark fishery along the U.S. coastline from Texas to New England. A.R. Vol. 1, tab I–1 (FMP, February 25, 1993). After three drafts and an animated public discussion, the FMP was promulgated by NMFS in accordance with the administrative rule-making process prescribed by 16 U.S.C. § 1855(d). *See* 50 C.F.R. part 678 (1993)(FMP). Generally, the FMP imposes resource management measures designed to prevent a destructive intensity of shark fishing and to incrementally, but ineluctably, rebuild the shark stock.[4]

Of the 73 species of sharks known to inhabit the Atlantic and Gulf coasts of the U.S., 39 commercially exploited species are grouped by the FMP into three classes: large coastal sharks ("LCS"), small coastal sharks ("SCS"), and pelagic sharks.[5] NMFS manages the three classes of sharks as a

---

(i) promote international conservation of the affected fishery;

(ii) take into consideration traditional fishing patterns of fishing vessels of the United States and the operating requirements of the fisheries;

(iii) are fair and equitable in allocating fishing privileges among United States fishermen and do not have economic allocation as the sole purpose; and

(iv) promote, to the extent practicable, implementation of scientific research programs that include the tagging and release of Atlantic highly migratory species.

3. From among the ten, Section 1851(a) prescribes the following six considerations pertinent to this case:

Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of

fish shall be managed as a unit or in close coordination.

(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

4. As a final implementing regulation, the FMP has the force and effect of law. 16 U.S.C. §§ 1854 & 1855.

5. LCS include certain species of hammerhead sharks, nurse sharks, and certain species of requiem sharks (including sandbar, blacktip, dusky, silky, spinner, and tiger sharks). *See* 50 C.F.R. § 678.2(1). SCS comprise angel sharks and bonnethead sharks. SCS also include less commercially utilized species of requiem sharks,

theoretical "management unit" that ranges across state, federal, and international boundaries.

NMFS and shark scientists historically use "catch per unit of effort" ("CPUE") indices to detect decline and growth in stocks. CPUE indices provide an estimate of stock abundance by measuring the amount of fishing effort needed to catch a fish. Based on stock assessments compiled from existing CPUE data indicating that catches exceeded resource production since 1987, the FMP concludes that LCS are overfished. "Overfished" means "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(29).[6] The FMP also determines that SCS and pelagic sharks, while not overfished, are nonetheless fully exploited.

The FMP notes that both fish and fishermen migrate. The FMP concludes that, "Many species of sharks migrate beyond U.S. waters and are harvested by foreign nations. It is therefore necessary that the management regime consider transboundary distribution." A.R. Vol. 1, tab I, 1, at 105(FMP). The FMP also states that, "[I]n 1988, Cuba landed about 3,500 [metric tons ("mt") dressed weight] of sharks, Mexico harvested 12,000 mt of sharks in the Gulf of Mexico, and the total U.S. commercial catch was 5,276 mt." *Id.* Reviewing the Atlantic

sharks' migratory patterns and the international shark harvest, the FMP concludes that, "To effectively manage sharks throughout their range, cooperation, particularly with Mexico, should be sought through existing conventions and agreements, such as MEXUS–Gulf, International Convention for the Conservation of Atlantic Tunas, and others." *Id.*

To prevent overfishing and stimulate rebuilding of stocks, the FMP creates a comprehensive permitting system and establishes the first commercial catch quotas and recreational bag limits imposed on the fishery. The FMP sets a yearly cap of 2,436 mt for LCS and 580 mt for pelagic sharks. The FMP also requires the uninjured release of sharks captured other than as part of a commercial quota or recreational bag limit. The FMP further bans the unseemly and pernicious practice of "finning" (removing only a shark's fins and discarding the helpless and rudderless shark into the sea, causing inexorable death by starvation or predatory attack) and fixes at zero the total allowable level of fishing by a foreign flag vessel in the U.S. exclusive economic zone.[7] *See* 50 C.F.R. part 678 (1993).

The FMP also requires data collection to enable NMFS to monitor the extent of shark fishing, adjust future catch quotas, and implement other management measures.[8] The FMP also compels selected vessel operators

---

including the sharpnose shark species found inshore and in near-shore areas. *See* 50 C.F.R. § 678.2(2). Pelagic sharks comprise cow sharks, mako sharks, porbeagle sharks, thresher sharks, and certain species of requiem sharks (including blue sharks and oceanic whitetip sharks) that range widely over entire ocean basins. *See* 50 C.F.R. § 678.2(3).

The three categories of sharks governed by the FMP correspond to classifications based on gear-specific and area-specific fisheries. LCS are targeted primarily by a directed shark longline or gillnet fishery and are also harvested by other gear types and taken as bycatch in other fisheries. Whereas SCS are targeted by rod-and-reel fishermen and also are caught as bycatch in other fisheries including the shrimp fishery. Pelagic sharks are often harvested by longline vessels incidental to tuna and swordfish and are occasionally targeted by commercial fishing vessels in northern areas.

**6.** The Secretary recently issued a report to Congress certifying that LCS (along with other species) are overfished. *See* Report to Congress pp. 47–48 (defendant's exhibit E); 16 U.S.C. § 1854(e)(1). Pursuant to § 1854(e)(1), the Secretary must now develop, within a year, a management plan to end overfishing and to rebuild LCS within the shortest period of time possible.

**7.** The exclusive economic zone of the United States is the territorial sea extending 200 nautical miles from the seaward boundary of coastal states.

**8.** For the first time, NMFS requires all permitted owners or operators of vessels in the shark fishery to maintain "weigh-out sheets" documenting the species, the weight, and the price of catch sold. In addition, NMFS requires selected owners or operators to maintain and submit detailed logbooks documenting the kind and amount of

to host NMFS observers and to permit the collection of more detailed data. Also, the FMP imposes reporting requirements on individuals conducting recreational shark fishing tournaments. *See* 50 C.F.R. part 678 (1993).

Finally, the FMP establishes a "framework regulatory adjustment procedure" allowing timely annual changes to management (such as commercial quotas, trip limits, and recreational bag limits) as better data develop from FMP reporting requirements. A.R. Vol. 1, tab I, 1, at 85–87(FMP). In accordance with the regulatory adjustment procedure, NMFS receives information concerning possible changes in fishery management measures from two scientific sources, the Shark Evaluation Workshop ("SEW") and the Shark Operations Team ("OT"). The SEW and the OT meet annually to provide scientific information and guidance to NMFS and assist the agency in implementing the FMP, including annual quota adjustments.

The SEW convenes to evaluate available data on sharks and consider managerial implications of stock assessment results. NMFS prepares a report that contains the deliberations and conclusions of the SEW. The report, which constitutes the final stock assessment required by the FMP, contributes to the management decisions by NMFS and the Secretary.

The OT is an advisory group that includes staff and members from each of the regional councils and NMFS staff and scientists. The purpose of the OT is to monitor the shark fishery and the effectiveness of the FMP and (through the regulatory adjustment procedure) to recommend necessary adjustments to the management measures. The FMP permits the NMFS to act independently from the recommendations of the OT if NMFS "finds that[,] based on the best available scientific information on the biological condition of the shark resources or economic conditions of the fishery, . . . adjustments in the

gear used, the time fished, the location fished, and the number of each species caught, landed,

management measures are required." *Id.* at 87. The FMP projected that its management measures would permit LCS stocks to rebuild by five percent each year until the fishery reached maximum sustainable yield ("MSY"), the maximum level of continuously renewable catch. *Id.* at 65. The FMP rejected more aggressive rebuilding goals (*e.g.*, quotas yielding a ten percent annual rebuilding rate) because, at the time, FMP considered unnecessary the short term costs to the commercial fishing industry. As it turns out, the FMP's initial estimates regarding the expected rate and amount of rebuilding were materially optimistic.

### The 1993–1996 Quotas

The initial 1993 LCS quota of 2,436 mt contemplated as a target a 43 percent reduction from the estimated 1991 LCS commercial landings of approximately 4,300 mt. In 1994, the Secretary raised the annual LCS quota to 2,570 mt, as prescribed by the FMP. The Secretary maintained the LCS quota at this level in 1995 and 1996. Lacking additional data, the SEW did not convene in 1995. However, NMFS prepared a report essentially repeating the observations and conclusions of the SEW's report for 1994. In deciding to maintain the LCS quota at 2,570 mt from 1994 through 1996, the Secretary examined both scientific and economic considerations pertaining to the LCS fishery and its participants. NMFS decided not to implement the FMP's scheduled LCS quota increases in 1995 and 1996, explaining that the 2,570 mt quota "emerged as the most preferable level, or at least a reasonable compromise between suggestions ranging from a complete closure to a quota increase." A.R. Vol. 1, tab III–7, at 8.

Various factors contributed to NMFS's decision not to implement the planned commercial quota increases. First, the 1994 SEW noted that LCS stocks may have declined more than previously estimated during the 1970's, the period preceding the development

and discarded.

of the U.S. commercial shark fishery. Second, the SEW observed that commercially prominent sandbar sharks may live longer and reach sexual maturity later than previously believed. In sum, SEW's insights suggested that sandbar shark stocks are incapable of rebuilding as quickly as predicted originally by the FMP. Finally, the SEW produced updated CPUE data that offered no evidence of vibrantly rebuilding stocks.

The Secretary nonetheless opted against a 33–50 percent LCS quota reduction for 1995, concluding that such a limit "would be restrictive for the majority of vessels participating in the shark fishery, and thus would cause financial hardship on vessels already commercially fishing for large coastal sharks and . . . could result in increases in fishing effort on other fishery resources." A.R. Vol. 1, tab III–7, at 9. In 1996 the Secretary rejected similar quota reductions for similar reasons. NMFS's Decision Memorandum for the 1996 LCS quota foreshadowed that the upcoming SEW "may provide a scientific basis for setting quotas in 1997 and beyond." A.R. Vol. 1, tab IV, 1, at 3. In recommending the 1994–1995 quota level for 1996, NMFS explained also that "there is no evidence to suggest that a one-year delay in quota reductions will lead to irreversible stock decline for any of the species in the large coastal complex." *Id.*

### The 1997 Quota–Setting Process

The Secretary initiated the rule-making process culminating in the 1997 quotas in accordance with the FMP's regulatory adjustment procedure. The 1996 SEW meeting convened in June, 1996, resulting in the 1996 SEW report. A.R. Vol. 2, tab IV–C–3 ("SEW report"). The 1996 SEW report notes that the FMP and its management measures, including the quotas, caused a detectable decline in LCS mortality. For example, the report states that peak recorded U.S. LCS commercial landings predating the

FMP were approximately 4,600 mt. By 1995, recorded LCS commercial landings declined by 48 percent from the 1981 recorded level to an estimated 2,570 mt.[9]

The 1996 SEW report notes that the reduction in mortality also diminished declines in catch rates for LCS. Of twenty-six species, seven showed "either positive slope estimates or slope estimates which could not be differentiated from zero at a 90 percent significance level," indicating no decrease in stock. A.R. Vol. 2, tab IV–C–3, at 4. In other words, seven species either increased in population or maintained the historical population. On the other hand, nineteen of twenty-six species showed negative trends in catch rates. In total, the most recent CPUE tables provide no assurance that stocks are rebuilding. The 1996 SEW report summarizes the CPUE data as follows:

> CPUE observations show relatively large declines from 1970's levels through the late 1980's. However, since that time the CPUE data do not show statistically significant evidence that stocks are either increasing or decreasing.

*Id.* at 5.

In addition to reviewing updated CPUE data, the 1996 SEW employed a demographic model, a production model, and a so-called maximum likelihood model to assess LCS population levels. The 1996 SEW report explicitly acknowledges that each of these statistical methods features commendable strengths and regrettable weaknesses.[10]

The demographic model utilizes the life history patterns (including age at reproduction, number of offspring, and survival rates) of various shark species to estimate the inherent capability of shark populations to propagate. Because the demographic model omits historical data on exploitation levels, its utility for assessing current stock status is limited. This limitation is compounded by the demographic model's failure to account

---

**9.** When accounting for unrecorded harvest, U.S. LCS actually declined an estimated 70 percent of pre-FMP levels by 1995.

**10.** The SEW conducted no new analyses with which to modify quotas for SCS or pelagic sharks.

for potential stock fluctuation due to migration of both fish and fishermen. The demographic model evaluates only a population's ability to replenish itself through reproduction.

Nonetheless, the demographic model provides a framework for determining the likely degree of resilience of shark stocks to fishing. Perhaps the most important observation derived from the model is that certain LCS, compared to most other fish species, have noticeably low rates of population increase, which translates into a fragile resilience and exposes the sharks to a threatening vulnerability. Available data from several demographic models suggest that the current or similar shark stock cannot sustain the mortality rates attributed to fishing. A study employing a demographic model for three LCS species notes that "several decades without any exploitation will be required to rebuild these seriously depleted stocks." A.R. Vol. 3, tab IV–C–12.

The production model utilizes the history of shark catches and historical trends in catch rates to assess population, measure mortality rates, and determine benchmarks, such as MSY (the maximum level of continuously renewable catch). The syllogistic theorem driving the model is simply that if catch rates predict fish stocks, then an increasing CPUE equates to an increasing stock and a declining CPUE equates to a diminishing stock.

One disadvantage of the production model approach is the assumption that shark populations are "closed," that is, the important circumstances that positively or negatively affect shark population, including, most notably, migration, are accounted adequately.

However, the advantages of employing the production model include the use of current and historical landings data, the availability of longer time series, and inclusion of estimated current. stock propagation and mortality rates. Because production models provide estimates of current fishing rates relative to MSY, the models contribute to evaluating the implications of different management measures on stock levels.[11]

Production modeling concludes that population is markedly below MSY, while mortality rates are markedly above MSY. Catch rate data demonstrate that many of the LCS species declined by more than 50 percent from the early 1970's to the mid 1980's Declines of this magnitude suggest that the stocks diminished to levels below the MSY. A production study notes that "1995 fishing mortality rates were approximately 1.7 to 2 times that which would produce a maximum sustainable catch in numbers, but slightly lower than those in 1993 when the FMP was implemented." A.R. Vol. 2, tab IV–C–3, at 14. These studies suggest that LCS stocks will continue to decline through 1999 unless catch rates are arrested by at least half.

Given the "exploratory" nature of the analyses, however, in assessing data for the 1996 studies, the production model shows a statistical coefficient of variation of 78 percent.[12] *Id.* Accordingly, the SEW report expresses its production modeling results in very inconclusive terms: "The variation resulting from ... bootstrapping showed that the CV on 1996 stock sizes was about 80% and that one could not show statistically significant differences between the 1996 stock level and any other year's level throughout the time series." *Id.*

**11.** Production modeling is particularly useful in the instance of sharks because historical catch data for the species are not available. For example, data concerning catch-at-age are difficult to obtain reliably for sharks and are absent from most of the historical catch records. As noted earlier, mandatory reporting and data collection under the FMP began in 1993. The production modeling approach is a common and simple stock assessment model that requires no catch-at-age information. Production modeling also allows scientists to view the available data in terms of the entire shark catch, rather than considering individual species.

**12.** The coefficient of variation is a common statistical measure of the dispersion of data and represents the standard deviation divided by the mean, which quotient is multiplied by 100. The standard deviation expresses a range above or below the mean into which an estimate is likely to fall.

Both the demographic and population models assume "closed" fish populations despite evidence that certain shark species are migratory and that foreign fisheries (including Mexican fisheries) harvest these species. For example, the SEW report cites recent tagging results that document sandbar and other shark species moving from the U.S. to Mexico. The FMP refers to similar studies with similar results.[13] Nevertheless, the SEW report refuses to significantly discount the "closed" population models, finding existing studies on migration inconclusive and incapable of predicting the extent and effect of migration.

The maximum likelihood estimate method ("MLE") approximates shark abundance and mortality based on catch histories, sampled average weights, and indices of fishing efforts. Unlike other models, the MLE method accounts for migration and assumes no closed population. The SEW projected shark abundance through 1999 by contrasting historical data sets from 1986–1995 and 1994–1995.

Based on the 1986–1995 data, the MLE projects that shark stocks will continue to increase through 1999 even if shark fishing continues at 1995 levels. However, the same analysis based on 1994–1995 data indicates that stocks will decline if shark fishing continues at 1995 levels or even if U.S. shark fishing is prohibited completely. The SEW concludes that the MLE projections differ according to the data set used (i.e., comparing 1986–1995 to 1994–1995), in part, because the pre-1994 data were collected before implementation of FMP's ban of finning and before the FMP's mandatory reporting and data collection requirements, the combination of which renders the earlier data less reliable.[14]

The SEW report concludes that FMP management produced no statistically significant evidence that LCS stocks were either increasing or decreasing. The scientific group observes that, even though NMFS already instituted catch limits (the 1995 catch was only 48 percent of the peak estimated catch of 1983), additional reductions in mortality of 50 percent or more are required to stabilize and potentially replenish LCS stocks. The SEW summarizes as follows:

> The modeling results and the CPUE trend analyses are consistent given the uncertainties in the basic data. The analyses show declines in abundance through the 1980's with a flat trend in the 1990's. The data did not allow the [Shark Evaluation] Workshop Committee to conclude that the trend since the advent of the FMP was statistically significant either up or down.

---

**13.** The FMP reviews tagging studies and concludes that the sandbar shark "has shown north-south movements along the U.S. east coast between Cape Cod and Texas. Sandbar sharks tagged off the northeast coast of the U.S. have traveled across the Florida Straits to Cuba and to Mexican waters as far south as the Yucatan. Some tagged sandbar sharks have traveled almost 5,000 km along the coast of North America." A.R. Vol. 1, Tab I, 1, at 24. The FMP also explains that, "[O]ther species (dusky, blacktip, night, silky, blue, shortfin mako, longfin mako, tiger, whitetip, spinner, and bignose) have also traveled between the U.S. east coast and the Gulf of Mexico." *Id.*

**14.** Because shark fishermen historically did not land the entire carcass, the pre-FMP data reveals neither the relative sizes nor approximate ages of sharks caught during that period. This lack of information precludes assessment of changes in the relative sizes or ages of sharks caught over time, both of which are indicators of the relative health of shark populations. The SEW report

summarized the preference for recent data as follows:

> The likelihood method does not demand a long time series of data so it was applied to 1994 and 1995 data only. Statistics for these two years are different from those of previous years because 1) the discarding of finned sharks at sea was curtailed by regulations thus the reported landings included most of the catch in those two years; 2) the species of sharks landed was recorded both by fish brokers and on mandatory logbooks by fishermen; 3) the number of vessels targeting sharks ("fishing effort") was derived for these two years from lists of shark fishing permit holders and their corresponding landings history rather than from anecdotal information; 4) at sea samples of the sizes and species of sharks caught and landed or discarded were available for those two years.

A.R. Vol. 2, tab IV–C–3, at 15.

A few of the individual CPUE's showed increases in the most recent year as did the 86–95 MLE analysis. Whereas, other CPUE's and the 94–95 MLE analysis (which is less tainted by underreporting of catches) did not. The models are consistent in that they indicate that the ability for Large Coastal shark populations to grow [is] limited. The models also predominately indicate that recovery is more likely to occur with reductions in effective fishing mortality rate of 50% or more.

A.R. Vol. 2, tab IV–C–3, at 20.

After considering the three models, the 1996 SEW participants could agree only that a confounding uncertainty intruded into their scientific exertions:

> The evidence is equivocal as to whether rebuilding has been initiated or that the stocks are declining further under the recent catch restrictions. The fishery has been regulated for just three years and since the expected rates of change in shark abundance are low, and our measures of stock abundance are uncertain, sufficient observational data are not yet available to test hypotheses about change in stock size after management measures were implemented.

*Id.* at 21.

The 1996 meeting of the OT convened in August 27–28, 1996. Although producing no consensus regarding management recommendations, the meeting provoked an energetic debate. OT members reached no general agreement on the conclusions of the SEW report or the report's management implications. Several OT members opposed the SEW's suggested quota reduction due to limitations on the probity of the underlying data and methodological suspicions pervading the modeling employed by the SEW. Others agreed with the conclusions of the SEW and suggested a (pre-emptive) 50 percent or more reduction in commercial quotas and recreational bag limits.

**The Proposed Rule**

On October 17, 1996, the Biodiversity Legal Foundation ("BLF") filed a petition for rule-making with NMFS. BLF requested that NMFS reduce the 1997 LCS quota by 50 percent and reduce the recreational bag limit to one shark per vessel per day. A.R. Vol. 4, tab IV–I, 10. Some private scientists also strongly advanced LCS quota reductions of 50 percent or more. Of course, the quota reductions for 1997 contemplated by NMFS and the SEW anticipated BLF's submission.

On December 20, 1996, NMFS issued a proposed rule and request for comments on the proposal to reduce the 1997 LCS quota and to reduce the recreational bag limit. 61 Fed.Reg. 67295 (December 20, 1996).[15] The proposed quota reduction was based, in part, on the SEW report, which concludes that overfishing continues to diminish LCS stocks. The NMFS Decision Memorandum explicitly adopted the SEW report's 50 percent LCS quota cut recommendation, stating, "The 1996 SEW final report constitutes the best scientific information available to NMFS management and the final action implements the report's recommendations." A.R. Vol. 5, tab IV–K, 40, at 3.

Accompanying the proposed rule was NMFS's certification, as prescribed by the Regulatory Flexibility Act, 5 U.S.C. §§ 601, *et seq.* (the "RFA"), which is that the quota reduction would cause no significant impact on a substantial number of small enterprises. Therefore, NMFS concluded that the regulatory flexibility analysis, contemplated by the RFA, was not statutorily required.

The proposed rule allowed the standard 30–day public comment period, which concluded on January 24, 1997. In response to requests by parties interested in affording fishery participants actual notice of the proposed regulation, NMFS extended the comment period until February 7, 1997. 62 Fed. Reg. 1872 (January 8, 1997); 62 Fed.Reg. 4239 (January 23, 1997). The agency re-

**15.** NMFS specifies in the proposed rule that, although it consulted with members of the OT, the agency acted independently of the OT in accordance with the FMP's regulatory adjustment process.

ceived more than 600 written comments from public officials, state environmental agencies, private environmental groups, commercial fishermen (including parties to this action), and other interested citizens.

Comments from the public and from the Small Business Administration included assertions that the proposed rule may significantly injure a substantial number of small businesses. In response to these comments, NMFS prepared a Final Regulatory Flexibility Analysis ("FRFA") pursuant to 5 U.S.C. § 604. A.R. Vol. 5, tab IV–K–34. The FRFA iterates the previous conclusion of NMFS that reducing the commercial quota was not expected to have a significant impact on a substantial number of small entities. *Compare* A.R. Vol. 5, tab IV–K–21, at 67298 (proposed rule) *with* A.R. Vol. 5, tab IV–K–23 (draft EA and RIR) with A.R. Vol. 5, tab IV–K–34 (final EA and FRFA). In conducting the FRFA, NMFS estimated that a directed shark fishermen earns at most $26,426 in gross revenues from the LCS fishery alone. Observing that revenues from shark fishing are typically supplemented by income from fishing on other species, NMFS concluded that:

> a reduction in quota should have relatively little impact on commercial shark fishing firms since the season, even if cut by more than half, would not adversely impact other harvesting operations that take up the majority of the fishing season.

A.R. Vol. 5, tab IV–K–34, at 32 (FRFA).

### The Final Rule

On April 7, 1997, NMFS issued the final rule, halving the commercial quotas for LCS from 2,570 mt to 1,285 mt, maintaining the quota for pelagic sharks at 580 mt, and es-

tablishing for the first time a quota for SCS at 1,760 mt.[16] 62 Fed.Reg. 16648, 16656 (April 7, 1997). The final rule imposes the same commercial quota levels proposed by the Secretary through the published notice of proposed rule-making on December 20, 1996. *See* 61 Fed.Reg. 67295 (December 20, 1996).

The LCS quota is divided into semi-annual segments. The LCS quota for the first half of 1997 closed shortly after NMFS published the rule in the Federal Register. The quota for the second half of 1997 closed within weeks after the LCS fishery's resumption on July 1, 1997.

### Procedural Background

On May 2, 1997, the plaintiffs timely initiated this action against the Secretary pursuant to the judicial review provisions of the Magnuson Act, 16 U.S.C. § 1855(f); the Regulatory Flexibility Act, 5 U.S.C. § 611(a)(1); and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). On May 28, 1997, the Court granted the parties' joint motion for a scheduling order, requiring completion of briefing on cross-motions for summary judgment by early September, 1997 (Doc. 5). By order dated June 14, 1997, (Doc. 2) the Court granted the plaintiffs' motion for expedited consideration of this case pursuant to 16 U.S.C. § 1855(f)(4).[17] On June 16, 1997, the defendant filed the administrative record with the Court (Doc. 8). On July 16, 1997, a coalition of environmentalists, including the Center for Marine Conservation, the National Audubon Society, the National Resources Defense Counsel, Inc., and the BLF, filed a motion to intervene as parties. Given the unique time constraints of this case and the briefing schedule, the Court denied as untimely the proposed intervenors' motion on August 22, 1997 (Doc. 34).[18] However, to avoid any

---

**16.** The final rule also implements other measures to conserve Atlantic shark stocks, including the reduction of recreational bag limits, the establishment of an exclusively catch-and-release fishery for white sharks, the prohibition of filleting at sea, and species identification by all owners, dealers, and tournament operators.

**17.** Section 1855(f)(4) states that, "Upon a motion by the person who files a petition under [the

judicial review provisions of the Magnuson Act], the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way."

**18.** *See Save Our Springs Alliance v. Babbitt,* 115 F.3d 346 (5th Cir.1997).

possible prejudice, the Court permitted the proposed intervenors to file *amici curiae* briefs for consideration by the Court on any issue presented by the parties.

The parties filed cross-motions for summary judgment (Docs. 25 and 32) pursuant to the Court's May 28, 1997, expedited scheduling order. Accommodating scheduling conflicts of counsel, the Court held a hearing on the dispositive motions on November 13, 1997, during which counsel for the parties and for *amici curiae* presented argument without time or other limitation.[19]

██ I reviewed the expansive administrative record and the submissions of both the parties and *amici curiae*. I carefully considered the arguments of counsel, noting gratefully the high quality of both the briefing and the argument. Despite the extraordinary yet typical demands of my docket, I have attempted to treat this matter expeditiously yet consistent with the demands of informed deliberation.[20]

### Standard of Review

██ The Magnuson Act requires the Court to apply the standards of review prescribed by the APA at 5 U.S.C. § 706(2)(A)–(D). 16 U.S.C. § 1855(f)(1)(B). In accordance with these standards, a regulation is invalid if demonstrably "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA defeats a regulation if review reveals that:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to

a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

██ The Court's role is to "assure[] that the agency action was based on a consideration of relevant factors" and that "the agency has exercised reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent." *Environmental Defense Fund v. Costle*, 657 F.2d 275, 283 (D.C.Cir.1981) (quotations omitted). The Eleventh Circuit recently confirmed that the Court's inquiry must be "searching and careful," although the standard of review remains "narrow." *See Fund for Animals v. Rice*, 85 F.3d 535, 541–42 (11th Cir.1996) (*quoting North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538–40 (11th Cir. 1990)). Of course, the Secretary retains broad discretion to promulgate regulations and warrants cautious deference in matters falling within his studied specialty and concerning which equivocal evidence and genuine scientific debate abound. *See Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104 (1st Cir.1997); *Central Arizona Water Conserv. Dist. v. U.S. EPA*, 990 F.2d 1531, 1539 (9th Cir.), *cert. denied*, 510 U.S. 828, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993).

### Counts One, Two, Three, Four, and Nine: § 1854(g) Duties and National Standard Three

In counts one, two, three, and four the plaintiffs allege that the Secretary failed to comply with specific requirements enumerated in 16 U.S.C. § 1854(g)(1), which governs the preparation and implementation of a fishery management plan or plan amendment.[21] The Secretary argues preliminarily that

---

**19.** The Court **APPROVES** the parties' stipulation at the hearing to dismiss counts five, ten, eleven, thirteen, and fourteen of the complaint, and these claims are **DISMISSED** accordingly.

**20.** My superseding and plenary responsibility "is to review the administrative record and to apply the law to this record." *Associated Fisheries of*

*Maine, Inc. v. Daley*, 954 F.Supp. 383, 385–86 (D.Maine 1997), *aff'd*, 127 F.3d 104 (1st Cir. 1997).

**21.** More specifically, count one alleges the Secretary did not comply with § 1854(g)(1)(C), which states that the Secretary "shall ... evaluate the likely effects, if any, of conservation and manage-

§ 1854(g)(1) is inapplicable because he acted in accordance with the FMP's regulatory adjustment procedure and the general authority provided by 16 U.S.C. § 1855(d). Section 1855(d) states that, "The Secretary shall have general responsibility to carry out any fishery management plan or amendment approved or prepared by him."

The Secretary apparently posits that the term "implementation" in § 1854(g)(1) is a constrained, nearly moribund, concept, such that when a fishery management plan is enacted, the Secretary's duties under § 1854(g)(1) conveniently dissipate. However, the Secretary's duties are not merely nominal. The statutory requirements attach and persist through the time the Secretary is "preparing *and implementing* any ... [fishery management] plan or amendment." *Id.* (emphasis added). In setting the 1997 quotas, the agency stated, "NMFS issues this final rule to *implement* certain measures authorized by the Fishery Management Plan for Sharks of the Atlantic Ocean." 62 Fed.Reg. 16648 (April 7, 1997) (emphasis added). Additionally, the legislative history for the current embodiment of § 1854(g)(1) employs broad terms, applying to "management measures developed under the new section." Presumably, the Secretary must evaluate practical experiences under the new plan to enable the judicious formulation of emendations. *See* S.Rep. No. 101–414, at 21 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6276, 6297.

Section 1855(d) provides no exception to § 1854(g)(1). The former provision is an encompassing grant of general regulatory authority extending retrospectively from the Magnuson Act's original enactment in 1976.

*See* Pub.L. No. 94–265, Title III, § 305(g). Congress enacted § 1854(g)(1) in 1990 as a substitute for the overlapping regional councils. Concurrently, Congress granted to the Secretary jurisdiction over Atlantic sharks. *See* Pub.L. No. 101–627, § 110(b). Section 1855(d)'s general provisions cannot limit § 1854(g)'s specific and subsequently enacted assignment of duties and obligations. "Specific terms prevail over the general in the same or another statute which otherwise might be controlling." *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 228–29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957).

The Secretary contends also that the plaintiffs' § 1854(g)(1) claims represent non-justiciable political questions because an adjudication requires the Court to intrude impermissibly into the foreign policy prerogatives of the President and his designees. With respect to counts one and four of the complaint, I disagree.

In *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court held that an issue is non-justiciable when there is:

a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving the issue; or the impossibility of deciding the issue without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multi-

---

ment measures on participants in the affected fisheries and minimize, to the extent practicable, any disadvantage to United States fishermen in relation to foreign competitors." Count two alleges violation of § 1854(g)(1)(F), which mandates that the Secretary "shall ... diligently pursue, through international entities (such as the International Convention for the Conservation of Atlantic Tunas), comparable international fishery management measures with respect to fishing for" Atlantic sharks. In count three, the plain-

tiffs claim that the Secretary failed to comply with his obligation to "ensure that [his] conservation and management measures ... promote international conservation of [Atlantic sharks]." § 1854(g)(1)(G)(i). Finally, in count four, the plaintiffs rely on § 1854(g)(1)(G)(ii) to allege that the Secretary failed to "take into consideration traditional fishing patterns of fishing vessels of the United States and the operating requirements of the fisheries."

farious pronouncements by various departments on one question.

The statutes implicated in counts one and four of the complaint fall comfortably outside the realm of non-justiciability as defined in *Baker*. Count one alleges that the Secretary failed to comply with 16 U.S.C. § 1854(g)(1)(C), which states that the Secretary "shall ... evaluate the likely effects, if any, of conservation and management measures on participants in the affected fisheries and minimize, to the extent practicable, any disadvantage to United States fishermen in relation to foreign competitors." Count four alleges that the Secretary failed to comply with 16 U.S.C. § 1854(g)(1)(G)(ii), which requires the Secretary to "take into consideration traditional fishing patterns of fishing vessels of the United States and the operating requirements of the fisheries." Sections 1854(g)(1)(C) and 1854(g)(1)(G)(ii) neither prescribe an agenda or formula for foreign policy nor otherwise intrude on any government function that the Constitution assigns exclusively to the executive branch. *See Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). The statutes require the Secretary to pursue only *domestic* action on a subject of *domestic* concern. In this respect, sections 1854(g)(1)(C) and 1854(g)(1)(G)(ii) are no different from other statutes governing the Secretary's fishery management. *See, e.g.*, 16 U.S.C. § 1854(g); 5 U.S.C. §§ 603 and 604. Accordingly, counts one and four are clearly justiciable.[22]

▮ Counts two and three pose more difficult questions. Count two relies on § 1854(g)(1)(F), which requires the Secretary to "diligently pursue, through international entities (such as the International Commission for the Conservation of Atlantic Tunas), comparable international fishery management measures with respect to fishing for highly migratory species." Count three is based on § 1854(f)(1)(G)(i), which requires the Secretary to "promote [the] international conservation" of sharks. The plaintiffs therefore challenge the sufficiency of the Secretary's efforts to pursue international agreements aimed at international fishery management.

▮ Sections 1854(g)(1)(F) and 1854(g)(1)(G)(iii) touch directly on the subject of when and how the U.S. will negotiate with other countries to achieve an international plan for shark management. However, the Constitution empowers neither Congress nor the courts to instruct the President and his subordinates when or how to engage in international negotiations.[23] The Constitution commits the negotiation of treaties with foreign nations to the executive.[24] International

---

**22.** Count four is substantially addressed in connection with counts twelve, fifteen, and sixteen.

**23.** In signing the bill containing the Magnuson Act's provisions on Atlantic Highly Migratory Species, P.L. 101–627, codified at 16 U.S.C. § 1854(g)(1)(F)–(G), President George W. Bush stated:

[N]umerous provisions of the Act could be construed to encroach upon the President's authority under the Constitution to conduct foreign relations, including the unfettered conduct of negotiations with foreign nations.... To avoid constitutional questions that might otherwise arise, I will construe all these provisions to be advisory, not mandatory.
Statement by President George W. Bush Upon Signing H.R.2061, 26 Weekly Comp. Pres. Doc. 1932 (Nov. 28, 1990)(presidential signing statement), *reprinted in* 1990 U.S.C.C.A.N. at 6304–1. In signing the 1996 amendments to the Magnuson Act, President William J. Clinton reiterated

that, "Under our Constitution, it is the President who articulates the Nation's foreign policy and who determines the timing and subject matter of our negotiations with foreign nations." Statement by President William J. Clinton upon signing S. 39, 32 Weekly Comp. Pres. Doc.2040 (Oct. 14, 1996)(presidential signing statement), *reprinted in* 1996 U.S.C.C.A.N. at 4120.

**24.** The Constitution explicitly and textually expresses an investment in the President of the "power, by and with the advice and consent of the Senate, to make treaties." U.S. Const. Art. II, § 2, cl. 2. Other constitutional clauses further establish executive power over foreign affairs. *See* U.S. Const. Art. II, § 1, cl. 1 ("The Executive Power shall be vested in the President"); U.S. Const. Art. II, § 2, cl. 1 ("The President shall be Commander–in–Chief"); U.S. Const. Art. II, § 3 ("[The President] shall receive Ambassadors and other public Ministers"). The Supreme Court repeatedly recognizes "that matters relating 'to the conduct of foreign relations ... are so exclusive-

**1428**

negotiations, including both their substance and their scheduling, are matters within the textually disposed territory of the executive branch. "The Judiciary is particularly ill suited to make such decisions, as courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." *Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). Further, Sections 1854(g)(1)(F) and 1854(g)(1)(G)(iii) provide no standard for determining whether the statutory mandates are properly implemented by a specialized executive action. Without durable and palpable constitutional guidance, judicial review is disarmed and disabled as a mechanism of decision if asked to engage in electing one from among many of the imponderable options manifest in the enterprise of foreign policy, which the Constitution sagaciously assigns exclusively to the President and his subordinates in the executive branch. I decline this promiscuous invitation to venture outside the constitutional arrangements. The defendant's motion for summary judgment with respect to counts two and three is granted.[25]

■ Count one asserts that in issuing 1997 shark quotas the Secretary failed to "evaluate the likely effects, if any, of conservation and management measures on participants in the affected fisheries and minimize, to the extent practicable, any disadvantage to United States fishermen in relation to foreign competitors." 16 U.S.C. § 1854(g)(1)(C). The FMP and the subsequent SEWs, including the 1996 SEW, recognized that certain shark species migrate and that foreign fishermen target domestic shark stocks. But studies on migration are preliminary and scientists have reached no comprehensive conclusions regarding the extent of migration of U.S. shark stocks and of foreign fishing.[26] The SEW report proposed additional tagging studies to further develop data on migration. However, absent more conclusive information, determining the relative disadvantage to U.S. fishermen of domestic quota measures is difficult, if not impossible.

■ Further, the Secretary specifically considered and rejected the alternative of closing altogether the U.S. shark fishery. The Secretary is required to minimize any disadvantage to U.S. fishermen only "to the extent practicable." The Secretary must balance this obligation with his mandate to conserve and rebuild overfished stocks. 16 U.S.C. § 1854(g)(1)(C). I do not believe Congress intended the Secretary to suspend his conservation and management obligations whenever fish stocks become lethally subject to both foreign and domestic harvest. *National Fisheries Institute v. Mosbacher*, 732 F.Supp. 210, 222 (D.D.C.1990). In enacting the Magnuson Act, Congress recognized the "danger that irreversible effects from overfishing will take place before an effective international agreement on fishery management jurisdiction can be negotiated, signed, ratified, and implemented." 16 U.S.C. § 1801(a)(4). Accordingly, I conclude that

ly entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Haig v. Agee*, 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981)(quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589, 72 S.Ct. 512, 96 L.Ed. 586 (1952)).

**25.** The defendant is entitled to this relief even if counts two and three are, contrary to my opinion, justiciable. The Secretary is currently undertaking measures to manage Atlantic sharks on an international scale, including cooperation with the International Commission for the Conservation of Atlantic Tunas and the United Nations Food and Agriculture Organization, tagging studies, and joint programs for study with Mexi-

can scientists. *See* Supplemental Declaration of Gary Matlock, A.R. Supp., tab IV–N. Although the Secretary's efforts in this regard may come too late and comprise too little, I believe that they satisfy the minimum required by §§ 1854(g)(1)(F) and 1854(g)(1)(G)(iii).

**26.** *See* A.R. Vol. 1, tab I–1, at 24(FMP); Vol.2, tab IV–C–3, at 10 (SEW report); A.R. Supp. Vol. 6, tab IV–M–25 (Dr. Ramon Bonfil, Instituto Nacional de la Pesca, Mexico); A.R. Supp. Vol. 6, tab IV–M–27 (Secretaria Del Medio Ambiemte, Recursos Naturales y Pesca "SEMARNAP," Mexico); A.R. Supp., tab IV–M, 26 (Dr. Raul Marin Osorno, Mexico).

the Secretary acted consistently with 16 U.S.C. § 1854(g)(1)(C).[27] Accordingly, summary judgment in favor of the defendant is appropriate as to count one.

### Count Six: The Administrative Procedure Act

■ The APA proscribes agency action that is arbitrary and capricious. 5 U.S.C. § 706(2)(A). In count six the plaintiffs challenge the Secretary's process of setting the 1997 LCS quotas and the validity of the scientific models underlying the quotas.

In assessing LCS stocks for the 1997 quotas, the Secretary considered scientific evidence indicating, in part, that (1) catch rates of many of the species and species groups declined by approximately 50 to 75 percent from the early 1970's to the mid–1980's, (2) stocks at the beginning of 1996 were 59 to 65 percent of that which would produce a maximum sustained catch, and (3) 1995 mortality rates were approximately 1.7 to 2 times that which would produce maximum sustained catch. *See* NMFS Decision Memorandum, A.R. Vol. 5, part IV–K–17.

The SEW report acknowledges that each stock assessment model used by the Secretary has inherent weaknesses. For example, the "closed" stock assumptions of the demographic and the population models are undermined by undeniable evidence that some LCS species migrate. However, the extent of migration remains uncertain. The record evidences conflicting views on the issue. Absent more conclusive documentation of the piscatory effects of migration, I cannot peremptorily determine that the Secretary's "closed" model evaluations are legally void or dismissively irrational.

As indicated previously, each model offers at least limited utility, providing a different but constrained perspective on common data. The modeling studies indicate collectively that, at present, there is no scientifically mature, experientially validated, and "proper" method for measuring and projecting shark stocks. Presumably the ideal method awaits the assimilation of more complete data, the restoration of old data, the development of more refined modeling, more conclusive studies on the effect of stock and fishing migration, and the enlightening passage of time and events. Until such time, the Secretary's superintendence with respect to LCS will necessarily entail some measure of intuitive management that the proponents will applaud as wisdom and the detractors will condemn as mere caprice. The regulatory framework permits this managerial result and implies the predictable commentary. *See Fishermen's Dock Cooperative, Inc. of Point Pleasant Beach, N.J. v. Brown,* 75 F.3d 164, 172 (4th Cir.1996) ("[T]he Monitoring Committee indulged only in the kind of arbitrariness that is inherent in the exercise of discretion amid uncertainty and not the kind of arbitrariness that the statute condemns when it exists in tandem with capriciousness.").

> Administrative decisionmaking is not an exact science, and judicial review must recognize that some arbitrariness is inherent in the exercise of discretion amid uncertainty. Accordingly, courts reviewing this type of administrative decision must leave room for a certain amount of play in the joints.

*Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104, 111 (1st Cir.1997). Faced with unsettled science and data, the Secretary may exercise his statutory discretion and reasonably select from an array of reasoned choices.

The plaintiffs also suggest that the quota reduction is unwarranted because the FMP

---

**27.** For similar reasons, the defendant prevails on count nine of the complaint. Count nine alleges that the Secretary violated National Standard Three, which states that, "To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination." 16 U.S.C. § 1851(a)(3). As stated above, the Secretary is currently pursuing measures to manage Atlantic sharks internationally. In the interim, the Secretary manages the three classes of shark species according to the gear-specific fishery that targets them. The fact that some of the shark species migrate into foreign waters or are targeted by foreign fishermen does not preclude the Secretary from taking domestic measures to conserve and rebuild destructively fished stocks.

and its 1993–1996 quota levels stabilized the LCS stocks. The record tenaciously disagrees. Although catch quotas have been in effect since 1993, the record lacks significant and valid proof that LCS stocks are presently increasing. Most CPUE indices manifest a continued and significant decline from 1986–1995. The most pessimistic MLE model results (using data collected after imposition of FMP reporting requirements) indicate that the U.S. LCS stocks will continue to have a negative intrinsic rate of increase even under a zero-catch scenario, suggesting irresistibly the possibility that LCS may have already lost their ability to replenish and that these sharks are headed toward extinction. Even considering more optimistic projections, one must conclude that LCS—which reproduce relatively infrequently—have not increased in number since the Secretary implemented FMP measures in 1993. Considering the most updated and most complete data, the SEW in 1996 found no significant evidence of bountiful propagation. This fundamental observation proved the original FMP projections wrong and prompted the Secretary's dramatic, yet interim, prophylactic action.

The Secretary adopted the 1997 catch quotas to hedge against the risk of systemic failure and to achieve an immediate reduction in fishing mortality concurrent with the development of a long-term rebuilding schedule. The Magnuson Act and the FMP's regulatory adjustment procedure authorize the Secretary to compensate. In short, he did just that. *See* 16 U.S.C. § 1854(g)(1)(E) ("[T]he Secretary shall ... review, on a continuing basis (and promptly whenever a recommendation pertaining to fishing for highly migratory species has been made under a relevant international fishery agreement), and revise as appropriate, the conservation and management measures included in the plan"); 50 C.F.R. § 678.26 (1993) ("In accordance with the regulatory adjustment procedures specified in the FMP, the [Secretary] may establish or modify the following for species or species groups in the shark fishery: maximum sustainable yield, total allow-

able catch, quotas, trip limits, bag limits, size limits, the fishing year or fishing season, the species of sharks managed and the specification of the species groups to which they belong, and permitting and reporting requirements"); A.R. Vol. 1, tab I, 1, at 85–87(FMP). Under the circumstances, the Secretary's actions (including the 50 percent cut in commercial quotas for LCS) are not arbitrary and capricious. The quotas seem reasonable given the congressional mandate to rebuild overfished stocks, the centerpiece of the Sustainable Fisheries Act, Public Law 94–265, which amended the Magnuson Act. *See* 16 U.S.C. § 1854(e)(1), (3) (requiring the Secretary to identify fisheries that are overfished or are approaching an overfished condition and to develop, within a year, a management plan to end overfishing and to rebuild affected stocks of fish in the shortest period of time possible); 16 U.S.C. § 1851(a)(1).

Finally, I reject the plaintiffs' argument that, because they represent a domestic solution to an international problem, the Secretary's quota reductions are irrational. Inconclusive studies on migration, including the impact of migration on the U.S. commercial fishery, prevent one from labeling depleting LCS stocks as exclusively international in scope. The United States can certainly act domestically to manage and conserve shark species which, although proven to migrate into foreign waters, are subject to certain oblivion absent a robust measure of regulatory intervention. The Magnuson Act explicitly recognizes the inherent difficulty (including delay) implicit in pursuing and implementing international agreements. The Magnuson Act accordingly authorizes the Secretary to pursue appropriate domestic action to conserve migratory fish. *See* 16 U.S.C. § 1801(a). I find for the defendant as to count six.

### Count Seven: National Standard One

█ National Standard One requires that all "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fish-

ing industry." 16 U.S.C. § 1851(a)(1). As amended by Congress on October 11, 1996, the statutory definition of "optimum" specifically provides that the optimum yield of a fishery may be prescribed based on the maximum sustainable yield ("MSY") as *reduced* by any relevant economic, social, or ecological factors. 16 U.S.C. § 1802(28). For overfished species, such as LCS, management for optimum yield necessarily provides for rebuilding of stocks to a level consistent with MSY. *Id.*

The SEW has yet to obtain a definitive estimate of the level of shark fishing corresponding to MSY. *Compare* A.R. Vol. 2, tab IV–C–3, at 21 (1996 SEW report) *with* A.R. Vol. 1, tab II–1, at 9–10 (1994 SEW report). However, merely because the 1996 SEW report arrives at no concrete numerical MSY specifications does not mean that the 1997 quotas violate National Standard One. *National Fisheries Institute,* 732 F.Supp. at 225. Undeveloped science and incomplete data currently preclude precision.

Further, the record fails to support the plaintiffs' argument that all of the components for determining optimum yield have remained static since the FMP was completed in 1993. The FMP premises its LCS management measures on the conclusion that LCS stocks are already overfished. One of the key findings of the 1996 SEW report is that LCS populations are not increasing under the present regimen. Some constituents and public comments strongly supported both further catch restrictions and closing the U.S. shark fishery until rebuilding is evident. *See, e.g.,* A.R. Vol. 4, tabs IV–D–3,5; tab IV–G–4; tab IV–H–1,5,6, Vol. 7, tab V.

In these circumstances, the relevant inquiry under National Standard One is not whether the challenged quota ensures to shark fishermen the highest possible catch during the current year but whether the quota is consistent with preventing overfishing while awaiting the onset of an optimum yield on a *continuing* basis. In *Trawler Diane Marie, Inc. v. Brown,* 918 F.Supp. 921, 929 (E.D.N.C.), *aff'd,* 91 F.3d 134, 1996 WL 406255 (table)(4th Cir.1996), the court specifically considered the requirements of National Standard One and affirmed the interim decision of the Secretary to close a scallop fishery. The court reasoned that the interim measure expedited the achievement of optimum yield for the fishery, in part because prevention of overfishing in the interim more nearly guarantees the long-term health of the fishery. Similarly, the court in *J.H. Miles & Co., Inc. v. Brown,* 910 F.Supp. 1138, 1148 (E.D.Va.1995), found that the Secretary's 1995 commercial catch quotas for surf clams and ocean quahog conformed comfortably to National Standard One because the Secretary acted to impress on the status quo a presumably wholesome arrangement, which the Secretary believed to benefit the long-term health of the fishery.

As in *Trawler Diane Marie* and *J.H. Miles,* the Secretary's decision to reduce the LCS quotas constitutes a cautious, risk-averse approach, designed to safeguard against further injurious declines in shark stocks and to ensure optimal yield and repopulation. Given current knowledge about the status of LCS stocks, the 50 percent reduction imposed by the Secretary approximates purposefully the 50 percent probability that the LCS stocks will increase by any amount between 1996 and 1999. Considering the uncertainty in the data and the current stock assessment method, the Court defers to the Secretary's decision in "making difficult policy judgments and choosing appropriate management and conservation measures based on [his] evaluation[] of the relevant quantitative and qualitative factors." *National Fisheries Institute,* 732 F.Supp. at 223; *see also Fishermen's Dock Cooperative, Inc. of Point Pleasant Beach, N.J. v. Brown,* 75 F.3d 164, 172 (4th Cir.1996) ("[T]he choice of how much assurance [that the target fishing mortality will not be exceeded] to indulge in must be a policy choice left to the reasonable exercise of the discretion of the statutorily-authorized

decision-makers.").[28] Accordingly, summary judgment in favor of the defendant is appropriate as to count seven.

### Count Eight: National Standard Two

 National Standard Two provides that, "Conservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). Under the "best scientific information available" standard, the Secretary must derive his determinations from the sum of pertinent and available information. *See Parravano v. Babbitt,* 837 F.Supp. 1034, 1046 (N.D.Cal.1993)("[b]y requiring that decisions be made on the best scientific information available, the [Magnuson] Act acknowledges that such information may not be exact or totally complete"), *aff'd,* 70 F.3d 539 (9th Cir.1995), *cert. denied,* 518 U.S. 1016, 116 S.Ct. 2546, 135 L.Ed.2d 1066 (1996); *J.H. Miles,* 910 F.Supp. at 1152 ("[T]he Magnuson Act permits the Secretary's designees to act on information that is incomplete or if there are differences in available information.").

 In many respects the data and the methods used by the Secretary in assessing stocks fail to yield definitive conclusions. Inconclusiveness alone, however, does not preclude the Secretary from acting based on a thorough consideration of available and relevant data. *See Trawler Diane Marie,* 918 F.Supp. at 929. Difficulties with the data and the nature of the scientific method are expected in managing a resource as elusive as a fishery. *See Associated Fisheries of Maine, Inc. v. Daley,* 954 F.Supp. 383, 389 (D.Me.1997) (affirming the Secretary's adoption of amendments to the northeast multispecies fishery management plan for species including haddock and yellowtail flounder), *aff'd,* 127 F.3d 104 (1st Cir.1997). The administrative record in *Associated Fisheries* recounts "strenuous disagreement among the scientists and economists" regarding the interpretation of data, the analysis of difficult problems, the interpretation of historical in-

formation, and prediction of the future. 954 F.Supp. at 389. However, in concluding that the Secretary acted within his regulatory discretion, the court reasoned that:

> it is appropriate ... for the Secretary to be conservative in dealing with the issue of conservation and, in the face of uncertainty, to take the more strenuous measures— even though they may unfortunately have a short term drastic negative effect on the fishing industry.

*Id.* at 390. As in *Associated Fisheries,* the administrative record before the Court elaborates "strenuous disagreement" among scientists but describes no abuse of discretion or caprice emanating from the Secretary.

The 1996 SEW report premises its conclusions on the analysis of shark fishery data by differing statistical models. The report acknowledges that each model includes some limiting omission, distortion, or the like. However, the 1996 SEW report concludes that LCS stocks are depleting because of insufficiently regulated harvests and that corrective action is necessary. National Standard Two, along with the crystalline congressional command informing the Magnuson Act, disfavors patient and lenient inaction by the Secretary until today's grim statistical forecasts are definitively experienced in the tangible form of future severe or irremediable declines in shark stock. As stated by the court in *National Fisheries Institute, Inc. v. Mosbacher,* 732 F.Supp. 210 (D.D.C.1990):

> [T]he Magnuson Act does not force the Secretary and Councils to sit idly by, powerless to conserve and manage a fishery resource, simply because they are somewhat uncertain about the accuracy of relevant information.

*Id.* at 220. The administrative record before the Court evinces a healthy debate (both within NMFS and between NMFS and participating constituencies) which featured noticeably vocal expert opinions both supporting and opposing the means employed by the

---

28. For these reasons I discount the plaintiffs' arguments that the 1997 quotas amount to "regulatory overkill." *See Fishermen's Dock Coopera-* *tive Inc. of Point Pleasant Beach, N.J. v. Brown,* 75 F.3d 164, 170 (4th Cir.1996).

Secretary. "It is the prerogative of [the Secretary] to weigh those opinions and make a policy judgment based on the scientific data." *Organized Fishermen of Florida v. Franklin*, 846 F.Supp. 1569, 1577 (S.D.Fla. 1994).

An agency charged with conserving and rebuilding morbidly fished stocks must wait for neither perfect science nor unanimous consent. Based on information available to him, the Secretary proceeded cautiously in setting interim quotas. *Trawler Diane Marie*, 918 F.Supp. at 929. Another authority may have chosen a different course. As stated by the Court in *Mosbacher*,

> [The Secretary's decision to implement the FMP] represents a reasonable accommodation of manifestly competing interests and is entitled to deference: the regulatory scheme is technical and complex, the agency considered the matter in a detailed and reasoned fashion, and the decision involves reconciling conflicting policies.

> . . . . .

> While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.

> . . . . .

> The responsibilities for assessing the wisdom of such policy choices and resolving

the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches."

732 F.Supp. at 226–27 (quoting *Chevron, USA v. Natural Resources Defense Council*, 467 U.S. 837, 865–66, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (citation and footnotes omitted)).

Judicial review at this juncture is limited to determining whether the Secretary intelligently and knowingly decided on a rational policy, given the scientific and judgmental tools available to him. I find that the Secretary fulfilled the minimum obligations imposed by the APA and National Standard Two. Accordingly, summary judgment in favor of the defendant is appropriate as to count eight.[29]

### Counts Four, Twelve, Fifteen and Sixteen: Economic Impact on Small Businesses

The Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 *et seq.*, requires an agency promulgating a rule to consider the effect of the proposed regulation on small businesses and to design mechanisms to minimize any adverse consequences. In 1996, by enacting Title II of the Small Business Regulatory Enforcement and Fairness Act of 1996 (the "SBREFA"), Pub.L. No. 104–121, Title II, Congress authorized judicial review of an agency's compliance with specific provisions of the RFA. Congress limited judicial review of the RFA to "agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610." 5 U.S.C. § 611(a)(1).[30] The SBREFA allows judicial review "in accordance with Chapter 7" of the APA, includ-

---

**29.** Although they focus their arguments for each count almost entirely on the LCS quotas, the plaintiffs also challenge the catch limits set for pelagic sharks and SCS in 1997. Following no new analysis during the 1996 SEW, the Secretary simply maintained the quota levels set previously for pelagic sharks pursuant to the FMP. I find no adequate reason to disturb this decision. I also find record support for the Secretary's decision to establish a quota for SCS. The FMP determined that SCS are fully fished in terms of the species' ability to reproduce and replace themselves over time. Of course, the reduction

in LCS quotas would have the predictable effect of transferring significant fishing pressure to SCS stocks, causing overfishing. Given the balance of his obligations under the Magnuson Act, I believe the Secretary reasonably concluded that the catch limits for SCS were necessary.

**30.** Agency compliance with §§ 607 and 609(a) is reviewable only in connection with judicial review of claims under § 604. 5 U.S.C. § 611(a)(1).

ing the "arbitrary and capricious" standard prescribed by 5 U.S.C. § 706(2)(A). 5 U.S.C. § 611(a)(1); *see Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104 (1st Cir. 1997).

In count fifteen the plaintiffs allege that NMFS failed to prepare an initial regulatory flexibility analysis ("IRFA") pursuant to § 603,[31] solicit comments on the IRFA, and prepare a final regulatory flexibility analysis ("FRFA") incorporating public comment proceedings, pursuant to § 604.[32] The RFA exempts an agency from the requirement to publish an IRFA and an FRFA if the agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b); *see Southwestern Pennsylvania Growth Alliance v. Browner,* 121 F.3d 106 (3rd Cir.1997). In count sixteen the

plaintiffs allege that the FRFA prepared by NMFS failed to comply with § 604. Both NMFS's certification pursuant to § 605(b) and the adequacy of a FRFA are reviewable. 5 U.S.C. § 611(a)(1).

At the time the agency issued the proposed rule, NMFS certified that the quota reduction was not expected to significantly affect a substantial number of small entities. In suspiciously cryptic terms included in the Draft Regulatory Impact Review, NMFS concluded that shark fishermen are nimble and adaptive in their fishing operations (that is, they pursue sharks in the season as well as other fish and at other times) and that the shark fishing season was historically too brief to permit a prudent fisherman to rely exclusively on annual revenue from shark fishing. A.R. Vol. 5, tab IV–K–16, at 28. In response, commercial fishermen submitted

---

**31.** Section 603(b) requires an IRFA to contain the following:

 (1) a description of the reasons why action by the agency is being considered;
 (2) a succinct statement of the objectives of, and legal basis for, the proposed rule;
 (3) a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;
 (4) a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;
 (5) an identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule.
Section 603(c) prescribes the following:
 Each initial regulatory flexibility analysis shall also contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities. Consistent with the stated objectives of applicable statutes, the analysis shall discuss significant alternatives such as—
 (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities;
 (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities;
 (3) the use of performance rather than design standards; and

 (4) an exemption from coverage of the rule, or any part thereof, for such small entities.

**32.** Section 604(a) requires each FRFA to contain:

 (1) a succinct statement of the need for, and objectives of, the rule;
 (2) a summary of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;
 (3) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;
 (4) a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and
 (5) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

comments explaining their dependence on sharks (especially LCS) and the quotas' punitive effect on their livelihood. The RFA watch-dog, the Small Business Administration ("SBA"), also strongly criticized NMFS's "no significant impact" certification, stating that it was "perplexed" and "bewildered" by the "illogical" certification. A.R. Vol. 5, tab IV–K, 13. Even "crude" calculations, SBA explained, demonstrate that the Commerce Department's RFA thresholds[33] were met. *Id.* at 2–3. Furthermore, the SBA concurred with industry that, contrary to NMFS's assurances, the directed shark fishermen's "conversion to other fishing operations is costly and probably not feasible." *Id.* at 3–4. Accordingly, it was "clear" to the SBA that NMFS should have prepared an IRFA. The agency refused to budge. *Id.* at 4. On April 1, 1997, NMFS re-certified to the SBA that the 1997 Atlantic shark quotas would not have the requisite significant impact. A.R. Vol. 5, tab IV–K, 65.

The plaintiffs point to plentiful record evidence undermining NMFS's certifications. NMFS inconsistently characterizes the universe of shark fishermen in the record. In some cases NMFS appears to rely on the 2,000–plus entities with Atlantic shark permits to represent the actual number of shark fishermen. In one of the agency's analyses, NMFS explains that, "In 1994, a total of 2,026 permits were issued to qualifying individuals and attached to vessels, but the 326 vessels that actually harvested the resource are deemed to comprise the shark fishery in the United States." A.R. Vol. 6, tab IV–M, 11, at 63. However, on March 25, 1997, NMFS informed NBC News that "NMFS estimates are that about 100–150 vessels regularly catch the quota." A.R. Vol. 5, Tab IV–K, 47.

Further, in a transparent and unbecoming effort to demonstrate limited economic dependence, NMFS inserted into its re-certification to the SBA the estimate that average gross revenue from shark fishing was only $26,426. The record fails to contain an adequate explanation of the agency's calculation, if any, leaving no possibility to gauge its rationality, which is manifestly suspect. Further, NMFS cannot demonstrate how the loss of a major portion of $26,426 (even assuming that figure has a rational basis) would not, pursuant to Department of Commerce regulations, constitute a significant economic impact on a substantial number of directed shark fishermen.

In addition, NMFS attempted to justify its re-certification to the SBA on the basis that shark fishermen can effortlessly transfer their fishing efforts to other fish stocks for which they might have (or may obtain) permits. The plaintiffs submitted three declarations (including one from an OT member and one from a Mid–Atlantic Fishery Management Council member) canvassing potential fisheries and refuting the agency's effortless transferability claim. In summary, these declarations aver that other potential fisheries (including those identified by the defendant as alternative fisheries) (1) are or will become subject to limited access plans that will not permit relatively new entrants to remain in the fishery (*e.g.*, swordfish, tuna, king and Spanish mackerel, snapper-grouper-tilefish reef fish complex, monkfish), (2) are often subject to restrictive quotas (*e.g.*, tuna and swordfish) and other effort limitations such as trip limits, longline prohibitions, and entry lotteries (*e.g.*, king mackerel, snapper-grouper, crawfish), and (3) cannot support additional fishing effort (*e.g.*, tilefish). Further, the declarations suggest that some shark fishermen cannot afford (or qualify for capital borrowing) to buy the gear used to harvest other species (*e.g.*, king mackerel, monkfish, summer flounder, squid, tilefish) and that the shark boats, approximating 40 feet from stern to bow, are unsuitable for

---

**33.** Under Commerce Department regulations, a rule is considered to have a significant impact if a significant number of small entities (twenty percent of those engaged in the fishery) have a reduction in gross revenues of more than five percent or if more than two percent of those engaged in the fishery are forced to cease operations. *See* A.R. Vol. 5, tab IV–K–16.

other fisheries (*e.g.*, swordfish, tuna, king mackerel).[34]

Finally, in formulating the FMP and quota adjustments prior to 1997, the Secretary refused to employ harsher quota measures out of concern for the effect of the measures on the industry. The Secretary's current position, that the quota reductions will have no significant effect on participants of the fishery, is at least incongruous with the Secretary's previous pronouncements and actions.

Ultimately, perhaps recognizing the tactical mistake of not preparing an IRFA, NMFS prepared a FRFA in a March, 1997, document entitled "Final Environmental Assessment and Regulatory Impact Review/Final Regulatory Flexibility Analysis." The FRFA added little substance to NMFS's prior "no significant impact" certifications. *Compare* A.R. Vol. 5, tab IV–K, 65, at 1–2 (SBA re-certification) *with* A.R. Vol. 5, tab IV–K, 34, at 32–33 (Final EA and RIR/FRFA). This effort partakes of an artifice to feign good faith, statutory compliance.

Having studied the entire record, I conclude that the Secretary's "no significant impact" certification and the FRFA fail to satisfy APA standards and RFA requirements. The record strongly indicates that the 1997 quotas, and most prominently the LCS quota, will significantly injure the prospects of shark fishermen pursuant to Commerce Department thresholds. The record also severely discredits NMFS's argument that no fishermen are dependent on shark fishing and that the plaintiffs can effortlessly transfer their fishing efforts to other stocks. One can no more readily change a bass boat to a flats boat than change directed shark fishing paraphernalia to equipment for profitable tuna fishing. To suggest otherwise is to transgress the knowledge and common sense that are insinuated into reality; it is a contrivance that imports arrogance.

The lapses and inconsistencies in the record most likely stem from NMFS's failure to prepare an IRFA in the first instance. Pursuant to § 603, an IRFA would have required NMFS to engage in a careful and meaningful study of the problem from the beginning. With notice of NMFS's position, the public could have engaged the agency in the sort of informed and detailed discussion that has characterized this litigation. Instead, NMFS chose an insular approach designed to block further investigation and public scrutiny. NMFS compounded this error by preparing a FRFA that constitutes an attempt to agreeably decorate a stubborn conclusion.

NMFS prepared an FRFA lacking procedural or rational compliance with the requirements of the RFA. Section 604 requires that any FRFA contain "a summary of the significant issues raised by public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments." 5 U.S.C. § 604(a)(2). NMFS could not possibly have complied with § 604 by summarizing and considering comments on an IRFA that NMFS never prepared. NMFS's refusal to recognize the economic impacts of its regulations on small businesses also raises serious question about its efforts to minimize those impacts through less drastic alternatives. Section 604(a)(5) requires each FRFA to "descri[be] ... the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes" and then to explain why the agency chose a particular course. NMFS may not have rationally considered whether and how to minimize the 1997 quotas' economic impacts because

---

34. I permitted the plaintiffs to file the extra-record affidavits on the limited question of whether the Secretary failed to consider relevant factors in framing his regulatory decision (Doc. 21). Such supplementation is permissible. 5 U.S.C. § 706; *see Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242 (11th Cir.1996). Consideration of extra-record evidence is the only method

of testing allegations that the government failed to allow sufficient notice and comment in the rule-making process. Nevertheless, although I find the supplemental declarations illuminating, my conclusions stand independently on the administrative record. *See Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir.1997).

the agency fundamentally misapprehended the unraveling economic effect of its regulations on small businesses.

I am mindful that the RFA does not require mechanical exactitude. However, the statute compels the Secretary to make a "reasonable, good-faith effort," prior to issuance of a final rule, to inform the public about potential adverse effects of his proposals and about less harmful alternatives. *Associated Fisheries*, 127 F.3d at 114–15. Consideration of the record as a whole convinces me that the Secretary's defalcation unlawfully compromised his ability to render a reasoned and informed judgment with respect to the reduced quotas' economic impact on small businesses. Accordingly, summary judgment in favor of the plaintiffs is appropriate as to counts fifteen and sixteen.[35]

### Remedy

The RFA affords considerable discretion in formulating an appropriate remedy for the Secretary's failure to comply with the statute. In granting relief for a violation, a court may take corrective action which includes remanding the rule to the agency and deferring enforcement of the rule against small entities unless the court finds that continued enforcement of the rule is in the public interest. *See* 5 U.S.C. § 611(a)(4).

Accordingly, the Court **REMANDS** the agency's RFA determinations to the Secretary with instructions to undertake a rational consideration of the economic effects and potential alternatives to the 1997 quotas. On or before May 15, 1998, the Secretary shall submit to the Court an analysis that complies with applicable law. *See, e.g., Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104 (1st Cir.1997). The Court will retain jurisdiction over this case to review the economic analyses the Secretary conducts pursuant to this order.[36] Considering the delicate status of the Atlantic sharks (especially LCS) and pursuant to § 611(a)(4), the public interest requires maintenance of the 1997 Atlantic shark quotas pending remand and until further order of the Court.

The Clerk is directed (1) to enter judgment in favor of the defendant and against the plaintiffs as to counts one, two, three, six, seven, eight, and nine of the complaint, (2) to enter judgment in favor of the plaintiffs and against the defendant as to counts four, twelve, fifteen, and sixteen of the complaint, (3) to terminate all pending motions, and (4) to administratively close this case pending further order of the Court.

---

35. Section 1854(g)(1)(G)(ii) of the Magnuson Act (count four) directs the Secretary to "take into consideration traditional fishing patterns of fishing vessels of the United States and the operating requirements of the fisheries." National Standard Eight (count twelve) also requires the Secretary to consider the importance of fishery resources to fishing communities to "(A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8). I find that summary judgment in favor of the plaintiffs is appropriate with respect to counts four and twelve to the extent consistent with this order.

36. The same remedy is appropriate for the Secretary's violation of National Standard Eight and § 1854(g)(1)(G)(ii). *See North Carolina Fishery Ass'n v. Daley,* Civ. No. 2:97cv339 (E.D.Va.1997) (imposing congruent remedy for RFA and National Standard violations).